**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**TAMIMENT, INC., Respondent.**

**No. 19271.**

United States Court of Appeals,
Third Circuit.

Argued June 24, 1971.

Decided Nov. 9, 1971.

Biggs, Circuit Judge, dissented and filed opinion.

John D. Burgoyne, Asst. Counsel, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, David E. Rosenbaum, Atty., N. L. R. B., on the brief), for petitioner.

Irving D. Lipkowitz, Lipkowitz, Plaut, Salberg & Harris, New York City (Melvin Salberg, David Kramer, New York City, on the brief), for respondent.

Before BIGGS and ROSENN, Circuit Judges, and KRAFT, District Judge.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The National Labor Relations Board has applied to this court pursuant to Section 10(e) of the National Labor Relations Act (29 U.S.C. § 160(e)) for enforcement of its order issued against respondent Tamiment, Inc., for violating Section 8(a) (1) of the National Labor Relations Act (29 U.S.C. § 158(a) (1)) [1] by refusing to allow access to its premises for union representatives attempting to organize its workers. The opinion of the Board is reported at 180 N.L.R.B. No. 171.

The sole issue raised is whether the union has made an adequate showing that there are no reasonable alternative means for generating face to face contact with workers without having access to the employer's property. In view of the nature of the issue, the operations of Tamiment's resort should be described.

Tamiment, Inc., is an adult summer camp operated from approximately the beginning of May to the end of September each year in the Pocono Mountains of Eastern Pennsylvania. It is about four and a half miles from Bushkill, Pennsylvania, and thirteen miles from the larger town of East Stroudsburg, Pennsylvania.

The resort is a largely self-contained entity. Its 2200 acres, 475 of which are developed, are totally enclosed by a barbed wire fence. The main entrance to the hotel is a private road, approximately "four city blocks long," leading from the highway to the entry gate. A guardhouse stands at the gate and controls all entry to the property. There is an employee parking lot just outside the entrance gate with a capacity for 200 cars. Although no general solicitation is permitted on the property, members of the public are permitted to enter to look around on one hour passes. Once inside the gate a guest can move freely around the property.

The resort has almost all the living and recreational facilities that its guests and the 85% of the staff who live on the premises need. Besides a dining room, there are lakes, swimming pools, golf, nightclubs and other activities. There is also a United States Post Office on the premises that will send and receive mail for guests and staff.

The staff live in cottages spread throughout the grounds. They are given all their meals free which they take in their commissary, or in the main dining room before the guests eat. They have available a laundromat, and they can use all the recreational facilities of the hotel except in peak vacation periods and on weekends. There are no private telephones in the staff cottages, although there are public telephones at various locations. Those members of the staff who wish can bring food in to cook on hotplates in their rooms. Staff who live off the premises are given the meals served during their work hours without charge.

On their free time, employees frequent the Log Cabin, a bar and grill

---

1. 29 U.S.C. § 158(a) (1) provides:
   "(a) It shall be an unfair labor practice for an employer—

   1. to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"

about one mile down the road from Tamiment, and other bars and restaurants in the area. They also go to the racetrack nearby and to other resorts in the Poconos. The nearest cinema is in East Stroudsburg, twelve to fourteen miles away. When the employees are on duty, most of them, with the exception of administrative and golf personnel, wear uniforms, but the management encourages them to wear regular clothes during their off-duty hours.

The staff is transitory. During the season the number of employees varies from about 300 in the slow spring and fall periods to a peak of about 435 during the summer. They are recruited from Florida, New York, New Jersey, and Pennsylvania. Job advertisements are sent to state and federal employment agencies and to many colleges. A large number of the work force are students employed during their summer vacations. Many workers stay only a few weeks, and most do not last the entire five month season. Although the management writes each winter to the past season's employees to ascertain if they wish to return to Tamiment for the upcoming season, only about 25% to 30% of the staff do so.

The employees work a variety of shifts. Some departments of the resort, such as reservations and maintenance, are on a twenty-four hour basis; others operate for eight to sixteen hours a day. Most people are on a six day week, although some waiters and waitresses are expected to work seven days weekly. An eight hour day is standard, but the dining room and beverage people have periods on and off duty throughout the day coinciding with meal hours and the operation of the nightclub. The housekeeping staff is also employed on a staggered work day basis.

During the spring of 1969, Local 558 of the Hotel and Restaurant Employees Union began an organizing campaign throughout resorts in the Pocono Mountains. Harvey Morse, the international trustee in charge of the local (Local 558 is in trusteeship) and its local organizer,

Serge Schuster, had responsibility for winning representation of the employees at Tamiment.

On or about April 1, 1969, Morse and Schuster went to Tamiment and talked with Victor H. Gerard, the Managing Director of the resort, and an associate, Alex Blaker. Morse suggested that because of a fire which had damaged Unity House, a nearby hotel owned by the International Ladies Garment Workers Union, it would be helpful for Tamiment's business if it were unionized. Gerard rejected the offer.

On May 12, the day before the season began in 1969, Schuster appeared at the gate to Tamiment, but was denied admission by the guard unless he had a permit from the management. He departed without meeting anyone and returned the next day, stationing himself near the employees' parking lot. He talked with four members of the staff. They signed authorization cards and at their request were given additional cards for other employees to sign. Schuster arranged to meet with them in a week. During the same visit Schuster also put union literature on various cars in the parking lot without interference by the guards.

Schuster again returned a day or two later and talked with Allen Menell, Administrative Manager of the hotel, who told him that if he wanted access to the employees he would have to have the permission of the management of Tamiment in New York. On May 15, the union sent such a letter, but it was never answered. On the following day, Schuster attempted to hand out leaflets just outside the gate, but Menell asked him to leave because traffic was heavy that Friday afternoon and he was causing congestion.

A few days later Schuster again returned. He did not find the four employees to whom he had previously talked, but he attempted to sign up three other workers just outside the guardhouse area. The guards interfered and refused to allow solicitation there.

On May 22, Schuster returned to Tamiment but was told by the guards that he could not come up to the guardhouse nor could he use the private road from the highway. Schuster noted that now there were "no trespassing" signs posted along the road. On May 28, Morse and Schuster met with Gerard, the Managing Director, to ask for permission to enter the grounds. Their request was rejected.

Thereafter, Schuster began going to the Log Cabin, a nearby bar and grill, and to another tavern in Bushkill, for the purpose of meeting employees. He continued to visit these places approximately twice a week until Tamiment closed at the end of September.

Mr. Schuster's final attempt to enter the property was a visit in mid-June as a guest during a meeting of two Philadelphia Cap and Millinery Union locals. Shortly after Schuster's arrival, Gerard and Menell received reports that he was talking to employees who were on duty and passing out literature. They sought him out and asked him to act like a guest or leave the premises. Schuster claims that he was then followed closely by security personnel and began to feel extremely uncomfortable even though he was not talking to employees. About two hours after the conversation, he decided to leave and checked out.

In sum, Schuster could claim that after a summer's effort he had spoken to about 25 employees and handed out about 150 authorization cards. He had secured only 12 signed cards.

On this record, the trial examiner found that management had violated Section 8(a) (1) of the National Labor Relations Act by excluding non-employee organizers from the premises when there were no effective off-premises channels of communication available to the union. He noted that the resort is a completely self-contained community, whose employees rarely need to leave. The staggered shifts and the lack of telephones make communication difficult. In his opinion, the union had made reasonable efforts to reach employees through the normal channels of communication, but such efforts were "doomed to failure." The only effective means was direct access to the premises. The Labor Board affirmed the trial examiner's findings.

If Tamiment's employees had undertaken this drive, there would be no question as to their right to campaign on its grounds. We are concerned with a different situation: the right of non-employee representatives of a union to have access to an employer's private property for the purpose of organizing his workers.[2]

The Supreme Court laid down the fundamental test for determining when non-employee organizers should be allowed to enter company property in NLRB v. Babcock & Wilcox Co., 351 U. S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). It held that "when the inaccessibility of employees makes ineffective the *reasonable attempts* by non-employees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize." (Emphasis ours.)

Has the union in the case *sub judice* made sufficient reasonable attempts to satisfy that test? In cases involving self-contained resorts where the employees live on the premises, union organizers face a more difficult task in communication with the workers than they do in the ordinary plant situation, where employees leave daily and return

2. This case is one of a growing number of cases involving unionization of self-contained resorts (NLRB v. Kutscher's Hotel, 427 F.2d 200 (2nd Cir. 1970); NLRB v. S. & H. Grossinger's, Inc., 372 F.2d 26 (2nd Cir. 1967); New Pines, Inc., 191 N.L.R.B. No. 144 (1971); H & G Operating Corp., 191 N.L.R.B. No. 110 (1971), in which the Labor Board has attempted to accommodate the employee's rights to organize under Section 7 of the National Labor Relations Act (29 U.S. C. § 157) with the employer's right to control his property.

to their homes. This problem is particularly acute in organizing where many believe that there is no substitute for some face to face contact between the union organizer and workers during the campaign. National Steel Corp., etc. v. NLRB, 415 F.2d 1231 (6th Cir.1969). However, these needs and problems do not require that the employer forego his right to limit access to his property in a non-discriminatory fashion, absent a showing that the union could not take alternative measures to generate face to face contact.

Respondent has pointed out that the Labor Board has recently suggested that union organizers should endeavor to use newspapers, television and radio before being allowed to enter company property (Falk Corp., 192 N.L.R.B. No. 100, p. 11, 77 L.R.R.M. 1916, 1920–1 (1971); NLRB v. Kutscher's Hotel, 427 F.2d 200, 201 (2nd Cir.1970)). We doubt that television and radio would have been an effective and reasonable alternative means of communication in this situation. In a hotel resort with employees working staggered shifts over a seven day work week, it is unlikely that a significant proportion of the work force would be able to listen to broadcast appeals at any one time. NLRB v. S & H Grossinger's, Inc., 372 F.2d 26, 29 (2nd Cir.1967). On the other hand, as we discuss later, newspapers might have served a limited useful purpose.

The union must make reasonable efforts to communicate with workers through alternative means and arrangements when seeking face to face contact. The first and most obvious procedure

for the union to follow would be to attempt diligently to reach workers when they are off company property. In this case Schuster tried to talk to workers outside the gate leading to Tamiment, and when told that such activities were not permitted because the guardhouse and employees' parking lot were on private property, he repaired to nearby taverns, hoping to meet employees there.

■ We cannot agree with the Labor Board that the failure of Schuster's efforts to bear fruit is sufficient to amount to an adequate basis for a finding that the union lacked reasonable channels of communication off-premises with Tamiment's employees.[3] While it may be difficult to describe generally what would amount to an effective effort to communicate with employees and generate face to face contact, there are certain obvious and relatively inexpensive additional steps that Schuster and Morse should have attempted to undertake.

■ They made no effort to obtain a list of all the employees of Tamiment so that the union could send mail directly to them. Although mail is no substitute for face to face contact (NLRB v. United Aircraft Corp., 324 F.2d 128, 130 (2nd Cir. 1963), cert. denied 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964)) the Board has found letter writing a useful first step in communicating with employees. (Falk Corp., supra). While management need not provide such a list in advance of a Labor Board sponsored election (Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966)), it is free to do so if it wishes, and it

3. We have examined the entire record pursuant to the mandate in Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951) where the Court taught that: "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

may be particularly willing to yield to this request to retain the atmosphere of quiet and serenity at its resort hotel.[4] Counsel for management at oral argument noted that Tamiment would have given the union such a list, that a United States post office facility was located on the property, and that the employer would not have interfered with any mail addressed to its employees by the union. This concession distinguished in part this case from *S. & H. Grossinger's, Inc.*, supra, where the Second Circuit enforced the Board's order to admit union organizers after a request for a list had been turned down.

The union did not request the right to post notices of any sort at various staff facilities on company property or on the employees' parking lot. While such notices may be of only marginal utility in stimulating interest in the union, the failure to make such a request does reflect on the union's lack of initiative in devising techniques to meet with Tamiment's employees.

Finally, the union failed to arrange for any meetings for employees. It neither extended an invitation for such a meeting through using a mailing list or through the employees it had already signed up, nor made announcements in the local newspaper. It is reasonable to expect that any employees interested in organizing would be willing to make some effort to attend a meeting sponsored by the union during their leisure time. (E. g., *Falk Corp.*, supra, at 1920). Although the staggered shifts and seven day work weeks of some of the people at Tamiment might have limited the number of those in attendance, the union should have attempted to set up such meetings.

■ It is only after the union has made a showing that it used reasonable efforts to utilize "other available channels of communication" that the Board should proceed to consider the total effectiveness of these efforts and the countervailing inconvenience and injury to the employer having union organizers on his premises. Were the union to have made the necessary showing in this case, it seems clear that such additional questions would have been proper for the Board's consideration.

■ Neither of the previous cases decided by the Second Circuit dealing with entry by non-employee organizers to rural resorts is dispositive in this case. In *S. & H. Grossinger's*, supra, the Second Circuit upheld the Board's order for entry because the union engaged in considerably greater efforts at organizing than at Tamiment and was met by outright management hostility. (*S. & H. Grossinger's*, supra, 372 F.2d at 29). In essence that decision was based on considerations of effectiveness we do not reach because of the union's failure to show a lack of any reasonable effort to utilize alternative channels of communication. Conversely, in *Kutscher's Hotel*, supra, where the union had direct face to face contact with the employees each day because ninety-five percent of them had to cross a public road to get from their living quarters to the hotel, the court found that the alternative means were adequate.

The record in this case shows nothing more than minimal efforts to communicate with respondent's employees. We are not satisfied that there is "substantial evidence on the record as a whole" to warrant an invasion of private property by non-employees for union organizational purposes.

The petition to enforce the order of the Board dated February 4, 1970 will be denied.

BIGGS, Circuit Judge (dissenting).

I conclude that the majority opinion puts too narrow an interpretation on NLRB v. Babcock & Wilcox Co., 351 U. S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956), which held that "when the inaccessibility of employees makes ineffective the reasonable attempts by non-employees to communicate with them

---

4. We do not hold that an employer must provide a list of its employees to union organizers.

through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize." I believe that non-employee union organizers made reasonable attempts to communicate with the employees of Tamiment. Schuster's efforts to organize did not bear good fruit principally because he was not allowed to contact the employees to a reasonable degree.

It is conceded by the majority that mail is no substitute for face-to-face contact, NLRB v. United Aircraft Corp., 324 F.2d 128, 130 (2nd Cir.1963), cert. denied 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971, and it is also apparently conceded by the majority that communication by radio or television broadcasts could not be effective. It should be noted that the union sent a letter to the management of Tamiment in New York requesting permission to come upon the premises and that the letter was never answered. It should also be observed that Schuster attempted to hand out leaflets just outside the Tamiment gate but that the administrative manager of the hotel asked him to leave because traffic was heavy and he was causing "congestion." Congestion may well have occurred at or near the Tamiment gates but since the Tamiment enclave was surrounded with barbed wire and the union organizers were not permitted on the premises, where else could union organizational cards have been appropriately passed out to the employees. One could hardly believe that stopping cars along a public road at some point distant from the Tamiment gates to pass out union cards would be a permissible or even a legal method of attempting unionization. Also, Schuster was told by Tamiment guards that he could not come up to the guard house, could not use the private road from the highway, and new "No Trespassing" signs were posted along the road after attempts were made at unionization. Schuster also claims that he was followed closely by security personnel when he attempted to communi-

cate with employees and that after a summer's effort he had spoken to about 25 employees, handed out about 150 authorization cards, but had secured only 12 signed cards. In fact, close to the end of the attempt to organize the record seems to support the conclusion that the union organizers were in effect prohibited from coming to the Tamiment grounds.

The case falls not only within *Wilcox, supra,* but also within the ruling of the Second Circuit Court of Appeals in NLRB v. S & H Grossinger's, Inc., 372 F.2d 26, 30 (2nd Cir.1967), where the Board's order was enforced insofar as it required Grossinger's "to permit nonemployee union organizers to come upon its premises in order to solicit employees."

An examination of the whole record indicates to me that there existed a degree of hostility on the part of Tamiment to unionization, and a desire to resist unionization in ways not compatible with the National Labor Relations Act and the decisions of the Supreme Court.

For these reasons I must respectfully dissent. I would enforce the Board's order.