### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### NEW PINES, INC., Respondent.

### No. 6, Docket 72–1025.

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 1972.

Decided Oct. 4, 1972.

**428**

Joseph S. Rosenthal, New York City (Friedlander, Gaines, Ruttenberg & Goetz, Barry N. Steiner, New York City, on the brief), for respondent.

Steven C. Kahn, Attorney, N. L. R. B. (Peter G. Nash, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Elliott Moore and Jan Weinberg, Washington, D. C., on the brief), for petitioner.

Before FRIENDLY, Chief Judge, and LUMBARD and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

This is the third case we have had in recent years in which the National Labor Relations Board has held that a hotel must allow union organizers on its property to provide access to employees. In NLRB v. S & H Grossinger's, Inc., 372 F.2d 26 (2 Cir., 1967), we enforced such an order; in NLRB v. Kutsher's Hotel & Country Club, Inc., 427 F.2d 200 (2 Cir., 1970), we did not. The key issue in all three cases is the same: whether "the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels . . . ." NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). In this case, the Board answered that question in the affirmative, and held that the hotel's refusal to allow access violated section 8(a)(1) of the National Labor Relations Act. Because we find no substantial evidence to support the Board's conclusion, we decline to enforce its order.

The hotel in question is the Pines Hotel, located—like Grossinger's and Kutsher's—in the Catskills region of New York State. The Pines is on Laurel Road, a public thoroughfare. On one side of the road are guest facilities, including rooms accommodating 900. There are also four buildings for staff.[1] On the other side of the road, opposite the main entrance of the hotel, are nine buildings known as the Riverdale, which the company leases for use primarily as a residence for employees. Three different entrance ways along Laurel Road lead into the Riverdale. During the period in question, the number of employees at the hotel varied from 380 at the height of the season to a low of about 100. During the peak summer months, 50 per cent of the employees lived off the premises in nearby towns, 30 to 37½ per cent lived in the Riverdale, and the rest lived on the hotel side of Laurel Road. Thus, during this period 80 to 87½ per cent of the employees lived off the hotel premises.[2] The company prohibited all solicitation by nonemployees on the hotel grounds but did not apply this rule to the Riverdale across the road or to the parking lot there, where commuting employees generally parked their cars before crossing the road to the hotel.

Attempts by the complaining union[3] to organize the hotel employees began in the early summer of 1969. The first organizer confined his efforts primarily to

---

1. A fifth building is used for this purpose when there is no room elsewhere.

2. In the slower months, the Riverdale was generally not used. During this period 40–50% of the employees lived on the ho-

tel premises and others lived in nearby areas.

3. Hotel and Restaurant Employees and Bartenders International Union, Local 343, AFL–CIO.

distributing handbills and cards in front of the hotel's main gate. He had little success. In late September, another organizer took over. By visiting employees at their homes and attempting to talk to them in diners, bars and restaurants, he made more progress. Despite his lack of any prior experience, the second organizer obtained about 68 signed authorization cards in less than three months. Nevertheless, the union failed to attract sufficient support to force an election. During its campaign, the union made six requests for access to the premises, all of which were denied by the company.

The trial examiner dismissed the complaint, chiefly on the grounds that:

1) the Union did have easy access to contact potential members on the unguarded premises of Riverdale and

2) the Union exerted only minimal efforts or organize Respondent's employees.

The Board, apparently by concentrating on the period after October 1, 1969, reached a contrary conclusion. It distinguished *Kutsher's*, supra, on the ground that there some 95 per cent of the employees could be contacted as they crossed a public road, while in this case:

[D]uring most of the year, the Union, despite more strenuous efforts than those exerted in *Kutsher's*, had no effective means of communicating with the 40 to 50 percent of the employees who lived on Respondent's premises.

The Board also relied on its then recent decision in Tamiment, Inc., 180 N.L.R.B. No. 171, since denied enforcement in 451 F.2d 794 (3d Cir. 1971), cert. denied, —— U.S. ——, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972). We believe that the Board, by disregarding what went on before October 1, erred and that there is no substantial evidence to support its findings and ultimate conclusion.

 As already indicated, one of the crucial questions in access cases is whether a union, before insisting that an employer "aid organization," has itself made "reasonable" attempts to communicate with the employees it seeks to organize. See NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112–114, 76 S.Ct. 679, 100 L.Ed. 975 (1956). It is quite clear to us that this condition was not met here. Although the first organizer testified to his "five days a week" efforts to organize, during which he was able to talk to only "three or four people," the trial examiner rejected much of his testimony, characterizing it as "incredible." We have already noted the contrast between the meager results of the organizing drive in the peak period and the much greater success when another organizer came in toward the end of September. Moreover, it is conceded that neither organizer ever made any attempt to enter the Riverdale complex to contact the many employees living or parking there.[4] It is true that after October 1, 1969, the Riverdale buildings were closed. But in the three months before, as the trial examiner emphasized and the Board ignored, "all that was necessary" to communicate with the employees living at the Riverdale was to "cross the road." We cannot disregard the union's lackadaisical organizing effort during that earlier, peak period in assessing the overall "reasonableness" of its efforts to communicate. The trial examiner also found that "the Union had no meeting place in the vicinity of the Hotel and attempted to arrange only one meeting of employees." The Board did not reject these findings; it merely ignored them.

Finally, the Board's distinction of *Kutsher's* disappears if one looks at the whole organizing period, rather than at just the slow season. If anything, this case is in some respects more favorable for the employer than *Kutsher's*. The Pines Hotel did not bar organizers from the main on-premises living quarters of the employees during the summer (the

4. The Board found that of the "maximum complement" of 380, 30–37½% (114 to 142 employees) lived at the Riverdale, and only 12½–20% (47 to 76 employees) lived in the inaccessible hotel premises.

Riverdale complex), while the contrary was the case in *Kutsher's*. The Board relies on our decision in *Grossinger's*, supra, but that case was quite different. Grossinger's displayed a pattern of hostility to the organizing campaign, including the application of a no-solicitation rule only to the union, and its entire premises were on a single tract, so that no employee could be effectively reached without access. In short, on this record the union's organizing efforts were simply insufficient to require the hotel to grant access to the union's organizer. See NLRB v. Tamiment, Inc., supra.

The Board's 8(a)(1) order also rested upon an alleged coercive interrogation of a part-time employee by the hotel general manager. The incident involved two brief, isolated telephone calls to a 16-year old busboy whose mother was a regular hotel employee. The violation, if any, was de minimis and on this record cannot properly form the basis of a cease and desist order subjecting the employer to contempt proceedings for all future time.

Enforcement denied.