**HUSKY OIL, N.P.R. OPERATIONS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–2077.

United States Court of Appeals, Tenth Circuit.

Jan. 29, 1982.

James C. Mallien (Michael H. Schaalman, Milwaukee, Wis., with him on the brief) of Quarles & Brady, Milwaukee, Wis., for petitioner.

Lynne E. Deitch (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Janet C. McCaa, Atty., Washington, D. C., on the brief), N. L. R. B., Washington, D. C., for respondent.

Before McWILLIAMS and LOGAN, Circuit Judges, and BOHANON,* District Judge.

* Honorable Luther L. Bohanon of the United States District Court for the Northern, Eastern, and Western Districts of Oklahoma, sitting by designation.

LOGAN, Circuit Judge.

Husky Oil N.P.R. Operations, Inc. (Husky) appeals from a decision and order of the National Labor Relations Board (NLRB or Board) ruling that Husky violated section 8(a)(1) of the National Labor Relations Act (NLRA or the Act), 29 U.S.C. § 158(a)(1), by denying the International Brotherhood of Teamsters, Local 959 (the union) access to Husky's remote Alaskan worksite named Camp Lonely for the purpose of encouraging Husky employees to vote for union representation. The Board filed a cross-application for enforcement of its order.

Under a contract with the United States Department of the Interior, Husky is engaged in petroleum exploration activities in the National Petroleum Reserve on the North Slope of Alaska. Husky's supply base and housing compound, Camp Lonely, is a remote outpost, located approximately 660 miles north of Anchorage and 75 miles southeast of Point Barrow, the northernmost point in the United States. Transportation to and from Camp Lonely is exclusively by airplane. Husky employees work twelve-hour shifts, seven days a week, normally outside of the camp compound. Recreation, meals, and lodging are provided at the camp. Most employees work four consecutive weeks and then leave Camp Lonely for two weeks of rest and recreation (R & R).[1]

In September 1978, representatives of the union, the Board, and Husky met to discuss holding a representation election for a unit of Camp Lonely employees. The union requested permission to personally solicit the approximately forty-five Husky employees who are included in the proposed bargaining unit. Husky denied this request on the ground that means of communication other than face-to-face solicitation at the camp were available to the union, offering instead to provide the union with a list of the names, home addresses, and telephone num-

---

1. Other employees receive two weeks of R & R after either two or six weeks of work.

bers of the bargaining unit employees as well as their R & R schedules. Union representatives rejected this offer and filed an unfair labor practice charge with the Board based on Husky's refusal to let union organizers visit the camp.

After hearing testimony in the case, the administrative law judge (ALJ) found that the only reasonable means of communicating with employees available to the union organizers was personal solicitation of the employees at Camp Lonely; further, that Husky had not rigidly enforced its no-visitation rule and had failed to prove the rule was necessary to maintain plant discipline and production. Based on these findings, the ALJ held that Husky's refusal to allow union organizers to contact employees at Camp Lonely violated section 8(a)(1) of the NLRA. The Board adopted the ALJ's findings and recommended order requiring Husky to allow the union to visit employees at Camp Lonely.

Husky asserts that the Board erred in finding that personal solicitation was the only reasonable means of communicating with Camp Lonely employees, arguing that such a finding cannot be justified when, first, the union has not attempted to use the alternative channels available and, second, alternative channels available to the union were adequate. Husky also appeals the ruling concerning its no-visitation rule.

The parties agree that resolution of this dispute rests on properly applying *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). In that case the Supreme Court held that an employer may exclude nonemployee union organizers from its property "if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution." *Id.* at 112, 76 S.Ct. at 684.

## I

Husky argues that because the union exerted little effort to reach Husky employees through other available channels of communication, the union has not sustained its burden of demonstrating that it made "reasonable attempts" to reach Husky employees. Husky points to the *Babcock & Wilcox* statement that personal access is necessary when the location of employees "makes ineffective the reasonable attempts by nonemployees," *id.*, and relies upon the holding in *NLRB v. Tamiment, Inc.*, 451 F.2d 794 (3d Cir. 1971), *cert. denied*, 409 U.S. 1012, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972), that "[i]t is *only after the union has made a showing that it used reasonable efforts* to utilize 'other available channels of communication' that the Board should proceed to consider the total effectiveness of these efforts and the countervailing inconvenience and injury to the employer." *Id.* at 799 (emphasis added); *accord, NLRB v. New Pines, Inc.*, 468 F.2d 427, 429 (2d Cir. 1972).

■ However, the Third Circuit's approach creates delay and additional expense for the union whenever those alternatives are unsatisfactory—it forces the union to undertake futile efforts in order to secure a favorable Board determination. We believe that *Babcock & Wilcox* does not require a union to resort to unsatisfactory means of communication and that we may assess the channels available to the union without first requiring the union to try them.

## II

■ Husky next contends that the Board erred in finding that the union could not reach employees by reasonable efforts to communicate through existing channels, and in holding that Husky, by denying access to the union, had violated Section 8(a)(1).

In reviewing decisions of the NLRB, our function is to decide whether the Board's determinations are based on a proper application of the law and supported by substantial evidence. When balancing the organizational rights of employees and the legitimate property rights of employers, "[t]he determination of the proper adjustments rests with the Board. Its rulings, when reached on findings of fact supported by

substantial evidence on the record as a whole, should be sustained by the courts unless its conclusions rest on erroneous legal foundations." *Babcock & Wilcox*, 351 U.S. at 112, 76 S.Ct. at 684 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951)). *See Hudgens v. NLRB*, 424 U.S. 507, 522, 96 S.Ct. 1029, 1037, 47 L.Ed.2d 196 (1976).

In *Babcock & Wilcox* the Supreme Court established guidelines for determining when an employer's right to exclude others from its property must yield to the employees' right to hear the union's message in person at the work site.

> "[A]n employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution. In these circumstances the employer may not be compelled to allow distribution even under . . . reasonable regulations . . . .
>
> " . . . But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the *usual channels,* the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize."

351 U.S. at 112–113, 76 S.Ct. at 684 (emphasis added); *accord, Central Hardware Co. v. NLRB*, 407 U.S. 539, 544–45, 92 S.Ct. 2238, 2241–42, 33 L.Ed.2d 122 (1972). Without stating when alternate methods of communication are considered satisfactory so that an employer may deny access to a union, the Court identified some of the "usual channels":

> "In addition to distributing literature to some of the employees, . . . during the period of concern herein the Union has had other contacts with some of the employees. It has communicated with over 100 employees of Respondent on 3 different occasions by sending literature to

them through the mails. Union representatives have communicated with many of Respondent's employees by talking with them on the streets of Paris, by driving to their homes and talking with them there, and by talking with them over the telephone."

*Babcock & Wilcox*, 351 U.S. at 107 n.1, 76 S.Ct. at 681 n.1 (quoting *Babcock & Wilcox Co.*, 109 N.L.R.B. 485, 492–93 (1954)). There the Court denied the union access to the employer's plants; in doing so, however, it stressed that the plants were close to the communities where a large percentage of the employees lived and the employees could reasonably be reached at their living quarters. *Id.* 351 U.S. at 113–14, 76 S.Ct. at 684.

Lower courts have struggled in determining what usual channels of communication must be unavailable or impaired in order to grant union organizers access to an employer's plant. They have placed considerable importance on face-to-face contact between union organizers and employees, especially when other forms of communication are ineffective or expensive. *NLRB v. Tamiment, Inc.*, 451 F.2d 794, 798 (3d Cir. 1971) (no substitute for face-to-face contact); *cert. denied*, 409 U.S. 1012, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972); *NLRB v. S & H Grossinger's, Inc.*, 372 F.2d 26, 29 (2d Cir. 1967) (radio and newspaper advertising "expensive and relatively ineffectual"); *cf. NLRB v. United Aircraft Corp.*, 324 F.2d 128, 130 (2d Cir. 1963) ("predictable alternatives" to personal contact "bear without exception the flaws of greater expense and effort, and a lower degree of effectiveness"), *cert. denied*, 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964). Relying on the Supreme Court's statement in *Babcock & Wilcox* that union organizers should have plant access "if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them," 351 U.S. at 113, 76 S.Ct. at 684, courts have granted union organizers access to employers' plants in remote locations when personal contact is difficult or impossible and other forms of communication are ineffective

or expensive. *E.g., Alaska Barite Co.,* 197 N.L.R.B. 1023 (1972), *aff'd mem.,* 83 L.R.R.M. 2992 (9th Cir.), *cert. denied,* 414 U.S. 1025, 94 S.Ct. 450, 38 L.Ed.2d 316 (1973); *NLRB v. S & H Grossinger's, Inc.,* 372 F.2d 26 (2d Cir. 1967).[2]

Camp Lonely is such a remote and isolated location. Face-to-face contact between union organizers and Husky employees is possible under only two circumstances: (1) at the Anchorage airport when Husky employees are arriving for their R & R; or (2) at their homes during their R & R. There are difficulties with both these alternatives. Meeting Husky employees at the Anchorage airport is difficult because R & R schedules are sometimes changed, weather conditions interfere with plane schedules, employees are often anxious to meet their families, and only three or four employees in the proposed bargaining unit land there each week. The Board rejected the home visit alternative because employees often spend their vacation time travelling or preoccupied with their families. Also supporting the Board's rejection of the home visit alternative is that only about thirty-two of the proposed bargaining unit's forty-five employees reside in or within thirty miles of Anchorage, six reside in other states, and the remaining seven live in Juneau, Fairbanks, or Barron. Apparently some Husky employees maintain an Alaska residence yet live outside the state, and others use their R & R to vacation outside Alaska. Finally, a Teamsters official testified that union attempts to reach employees at their homes had often been unsuccessful.

Other means of communication are available, but they too have their deficiencies.

Employees at Camp Lonely do not have individual phones; a public telephone is available in the hallway of the employees' living area, and is answered only if some employee happens to hear it.[3] The camp receives two radio stations, but only one is a commercial station that would accept union advertisements. Although this station broadcasts twenty-four hours a day and apparently would carry union announcements free, the camp receives its broadcasts only intermittently. Also, a company official testified that he knew of no employee who had a radio.

Camp Lonely does not receive direct commercial television broadcasts. Husky, however, does broadcast thirty-six hours of unedited television programing per week, purchasing it in videotape form from Northern Television, an Anchorage station. Each videotape contains an entire program, as televised to Anchorage viewers. A few employees have private television sets in their rooms and there is one large set in the recreation area where employees can watch the programs. A clerical employee of Husky chooses the videotapes according to her personal tastes, though receptive to the suggestions of other employees. Since Husky ultimately controls which videotapes are played, the union would have no assurance that employees would be able to view the programs on which the union advertised.[4]

Each day that an airplane arrives at the camp, Husky receives fifteen copies of the *Anchorage Daily Times* for its approximately 100 employees. In addition, passengers on air flights to the camp receive newspa-

**2.** In *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 799, 65 S.Ct. 982, 986, 89 L.Ed. 1372 (1945), the Supreme Court recognized the need for a union's access to an employer's "mining or lumber camp where the employees pass their rest as well as their work time on the employer's premises, so that union organization must proceed upon the employer's premises or be seriously handicapped."

**3.** The ALJ commented, "While there was some testimony indicating that there is a central loudspeaker or internal communication system, there was no testimony tending to indicate that

this would be available to the rank-and-file employees or accessible in case of an incoming call at the public telephone booth." R. III, 216.

**4.** A union memorandum listed six television programs typically selected for broadcast at Camp Lonely and indicated the costs involved in producing and broadcasting an advertisement with Northern Television. Four of the six programs accept local commercials, but on the shows accepting local commercials, a thirty second commercial costs, in addition to production expenses, from $30 to $125.

pers they can take with them. Advertising in the *Daily Times* was $7.50 for an ad 2″ wide by 1″ deep. The cost of advertising in the other newspaper, the *Daily News* of Anchorage, was $374 for a full page ad, $187 for a half page, and $94 for a quarter page, not including production costs.

The only other means of communication is by mail. The ALJ conceded that

"[i]t would be possible to reach the employees by mail and even though [Husky] might be fully aware of the fact that the employees were receiving union literature (because of the way in which the mail is disbursed or made available to the employees), I do not regard this procedure as totally undesirable."

R. III, 217.

Husky argues that because the proposed bargaining unit is only about forty-five employees, the union should have no difficulty personally contacting employees without using camp visits. But Husky is wrong if we accept the Board's finding that face-to-face opportunities are unsatisfactory because the employees are scattered, come through the airport only a few at a time about once a week, and tend to travel during R & R. Then the effectiveness and costs of alternative means assume more importance. None of the low cost alternatives except mail seem sure to reach all of the employees in the proposed unit. The Board saw problems with each alternative. We think this is a close case, especially because the employer was willing to give the union the names, home addresses, and telephone numbers of the employees. But our review is limited to determining whether substantial evidence in the record supports the Board's findings, and whether the Board's conclusions rest on erroneous legal foundations. *See Babcock & Wilcox*, 351 U.S. at 112, 76 S.Ct. at 684. We hold that the Board's findings and decision are supported by the evidence and the law.

### III

Husky also argues that the Board erred in finding that Husky's "No-Visitation Rule" was not rigidly enforced and that it failed to prove such a restriction is necessary to maintain plant discipline and production. An employer's discriminatory enforcement of its no-visitation rule is an alternative ground for granting a union access to the employer's premises. *Id.* at 112, 76 S.Ct. at 684. Because we have held that the Board's order to grant the union access to Camp Lonely is supported by its finding that there were no effective alternative means of communicating with employees, we need not address this contention.

The Board's order is ENFORCED.