NABORS ALASKA DRILLING,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nabors Alaska Drilling,
Inc., Petitioner,

v.

National Labor Relations
Board, Respondent.

Nabors Alaska Drilling,
Inc., Petitioner,

v.

National Labor Relations
Board, Respondent.

National Labor Relations
Board, Petitioner,

v.

Nabors Alaska Drilling,
Inc., Respondent.

Nos. 98–70548, 98–70550, 98–
70821 and 99-70247.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 2, 1999.

Decided Sept. 7, 1999.

William F. Mede (Argued) and Patrick J. McCabe (On the Briefs), Owens & Turner, Anchorage, Alaska, for the petitioner-cross-respondent.

Sharon I. Block (Argued) and Fred L. Cornnell (On the Briefs), National Labor Relations Board, Washington, D.C., for the respondent-cross-applicant.

Before: HUG, Chief Judge, TROTT and TASHIMA, Circuit Judges.

TROTT, Circuit Judge:

Nabors Alaska Drilling, Inc. petitions this court for a review of two final orders of the National Labor Relations Board ("NLRB" or "Board"). The Board cross-petitions for enforcement of the orders. In one case, the Board held in part that Nabors committed an unfair labor practice under § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1994) (the "Act"), by denying non-employee organizers access to Nabors' jobsites during an election campaign (the "access case"). The Board ordered Nabors to permit un-ion organizers access to jobsites and to post a notice of intent to comply with the order. In the other case, the Board held in part that Nabors violated § 8(a)(1) & (3) of the Act, 29 U.S.C. § 158(a)(1) & (3), by discriminatorily discharging two employees because of anti-union animus (the "discharge case"). The Board ordered Nabors to reinstate the terminated employees with back pay and to post a notice regarding the order.

We have jurisdiction under 29 U.S.C. § 160(e) & (f) (1994), and we agree with the Board on all issues with the exception of the remedy imposed in the discharge case. We therefore grant in part and deny in part Nabors' petition for review, and we grant in part and deny in part the Board's cross-petition for enforcement.

## I

Nabors is an Alaska corporation which provides oil well drilling services in Alaska, at four jobsites relevant to this appeal. Milne Point and Prudhoe Bay are on the North Slope, while Granite Point Rig and Bufflehead Rig are offshore in Cook Inlet. The Alaska State District Council of Laborers, an AFL–CIO affiliate ("Union"), sought to organize approximately 290 Nabors employees working at the four jobsites. The Union lost the representational election.

## A

### Refusal to Grant Access

At Prudhoe Bay, Nabors operates a camp where 119 potential bargaining-unit members stay during their two-week work cycle ("hitch"). At Milne Point, 65 potential members live during their hitch in a camp owned by Nabors, and 67 potential members live on the drilling rig. Twenty-nine potential bargaining-unit members work at the Granite Point rig and reside on the offshore platform. Twenty-two potential members work on the Bufflehead Rig, but reside at home and commute to the jobsite. A crew change-out for the

North Slope occurs every Friday, when approximately half of Nabors' Milne Point and Prudhoe Bay employees either arrive at or depart from the Anchorage International Airport on oil-company charters.

After arriving in Anchorage, the potential bargaining-unit members return home for their two-week leave. Ninety-five potential members live in Anchorage, 138 live in Alaska but outside of Anchorage, and 58 live outside of Alaska. Many employees do not stay at home, but travel during their leave.

The Union's organizational campaign began with meetings in the Anchorage Airport, inviting potential bargaining-unit members for coffee and doughnuts, usually before they departed for their hitch. The meetings were held each Friday from May through September, 1995. The Union received 143 signed authorization cards, about 49 percent of the potential bargaining unit, from employees eligible to vote in the election, and on September 1, 1995, filed a petition, seeking to represent Nabors' employees.

After filing the petition, the Union conducted an election campaign. Pro-union Nabors' employees distributed literature at the North Slope jobsites. The Union sent literature to employees' homes. The Union continued leafletting employees in the airport every Friday through the end of the election, but Union organizer Tim Sharp testified that this mode of communicating with the employees had limited effect. On October 2d, Nabors gave the Union the *Excelsior* list[1] of the addresses and telephone numbers of potential bargaining-unit members, through which the Union attempted to contact the employees individually. Because the first list was partly inaccurate, Nabors later revised it. The Union's efforts to reach potential bargaining-unit members during their leave resulted in contact with a total of 50 to 70 potential members. One pro-union employee spoke with about 75 potential members on the jobsite.

The Union discontinued the airport meetings, for the stated reason that a change in the airport's policy which prevented the Union from reserving the room monthly made it too difficult to plan and publicize the weekly meetings. The Union did not use newspaper or television advertisements, which testimony indicated are cost-prohibitive and unlikely to reach Nabors' employees. Further, Nabors' camps have only a small number of pay telephones, and employees below the supervisory level do not have telephones in their rooms.

On September 21, 1995, the Union requested access to Nabors's jobsites for organizational purposes. Nabors issued a tentative denial on September 25th and a formal denial on October 2d. The Union filed an unfair labor practice charge on October 4th, but chose to proceed with the election.

### B

### Discriminatory Discharge

Within a few months after the Union lost the representation election, Nabors terminated Ronald Pearson, Frank Anderson, and Steve Couture. Nabors does not appeal the Board's conclusion that Pearson was discharged for union activity, in violation of § 8(a)(1) & (3). Nabors contends that Anderson and Couture were terminated as a result of being caught smoking marijuana while on the job, rather than because of union activity.

Brian Buzby, the "tool pusher"—who is Nabors' highest-level supervisor on a drilling rig—on Rig 27E at Milne Point terminated Couture and Anderson on February 10, 1996, approximately three months after the Union lost the representation election. That morning, Buzby entered Couture's office. When Buzby first opened the door,

---

1. Under the Board's decision in *Excelsior Underwear*, 156 NLRB 1236, 1966 WL 18282 (1966), Nabors was required to provide the Union with a complete list of the names and addresses of all potential bargaining-unit members.

it was immediately closed in his face. Anderson testified that he was behind the door and jokingly pushed the door shut. When Buzby entered a few seconds later, Couture and Anderson were present. Buzby testified that he smelled marijuana smoke in the room, but at the time he did not mention the smell to the occupants. Anderson left shortly after Buzby arrived, according to Anderson's testimony because he had to return to work.

Buzby telephoned Nabors' personnel manager Belinda Wilson, who called Nabors' president, Jim Denney, and then called Buzby back. Buzby testified that he had decided, on his own and without interference from Wilson or Denney, to terminate Anderson and Couture because they had been smoking marijuana. However, Buzby's testimony and Wilson's testimony alike demonstrate that Buzby spoke with Wilson twice before informing Anderson and Couture of their termination.

Buzby spoke to Anderson, who was at his work station at the time, and informed Anderson that Buzby was sending him to town on an afternoon flight. Both parties agree that "sending you to town" means discharge. Later, Anderson went to Buzby's office and told Buzby "that wouldn't happen again." Buzby responded that he could not have "that" on the rig, and Anderson said: "[I]t's nothing we do all the time." Buzby does not dispute that he never mentioned the marijuana smoke or the specific basis for terminating Anderson. Anderson testified that he thought he was being terminated for socializing.

Buzby called Couture into Buzby's office. According to Buzby's testimony, Couture asked whether it would help to say that he would not ever do it again before Buzby told Couture that Couture was being sent to town. Couture testified that Buzby spoke first, and the ALJ credited Couture's testimony. Couture testified that he thought he was discharged because he was socializing with Anderson during working hours. Couture also testified that he was not surprised by the

sanction because of his involvement the previous fall with the Union.

Buzby then called both Couture and Anderson to his office on the Rig in the presence of Charlie Martin, the driller and Nabors' second in command on the Rig. Buzby testified that Wilson had instructed him to be certain, in the presence of a witness, that Anderson and Couture knew why they were being terminated. Martin testified that Buzby had asked him to sit in as a witness during this meeting. Martin testified that Buzby said: "[Y]ou both know why you're being sent to town," and neither Couture nor Anderson replied. Martin testified that Buzby then said that they could each take a urinalysis and return if they passed, and Anderson's and Couture's testimony corroborated Martin's. Buzby testified that he did not say Anderson and Couture could return if they passed the urinalysis. The ALJ credited Martin's testimony.

When Anderson and Couture returned to Anchorage, they each took a urinalysis test. Couture's test returned positive for marijuana use and Anderson's sample was inconclusive because, according to expert testimony, it had been diluted. Nabors' expert thus testified that neither Anderson nor Couture passed the urinalysis tests. Before the results of Anderson's and Couture's urinalysis tests were known, Anderson telephoned Wilson, who informed him that neither he nor Couture were eligible for rehire.

After Anderson's and Couture's terminations, Nabors conducted urinalysis tests of all employees on Rig 27E. Two other employees tested positive for marijuana use and were discharged, but later returned to work for another hitch. Wilson's explanation for this differential treatment was that Couture and Anderson were caught smoking marijuana on the job, while the other two employees merely tested positive for marijuana, Couture and Anderson were not eligible for rehire though the others were. Nabors' written drug-testing policy does not make any dis-

tinction between actually being caught using drugs and merely testing positive for drug use. Anderson and Couture are the only Nabors employees caught using drugs in the workplace since 1985, when Wilson became personnel manager.

Anderson testified that he had been "quite outspoken for the union." His involvement took place from mid-summer, 1995, through the election in October and November, 1995. Likewise, Couture was a Union supporter during the campaign and passed out literature and helped to distribute pro-union videos from late June, 1995, through late October.

The Union filed unfair labor practice charges on February 1, 1996, February 20, 1996, and February 29, 1996. All of the charges were later consolidated into one case, which was then consolidated with the unfair labor practice charge regarding refusal to grant access.

## II

In the access case, the ALJ found that no reasonable alternate means existed for the Union to reach Nabors' employees and held that Nabors' refusal to permit access to its jobsites was an unfair labor practice. The ALJ ordered Nabors to permit the Union to access its jobsites on request and to post a notice regarding (1) the violation, (2) the ordered remedy, and (3) Nabors' intent to comply. She also set aside the results of the election and ordered that a new election be held. The Board affirmed.

In the discharge case, the ALJ found that Anderson and Couture were both terminated because of their Union involvement, and the Board affirmed the ALJ's findings. The Board also affirmed the ALJ's legal conclusion that terminating Anderson and Couture for this reason was an unfair labor practice in violation of § 8(a)(1) & (3). The ALJ ordered Nabors to reinstate both employees with back pay and to post a notice regarding (1) the violation and (2) Nabors' intent to comply with the remedy. The Board affirmed the remedy.

## III

■ We review factual findings of the Board under the substantial evidence standard. *NLRB v. Iron Workers of Cal.*, 124 F.3d 1094, 1098 (9th Cir.1997). When conducting substantial evidence review, we review the entire record and determine whether "it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 118 S.Ct. 818, 823, 139 L.Ed.2d 797 (1998). Furthermore, credibility findings are entitled to special deference. *NLRB v. Mike Yurosek & Son, Inc.*, 53 F.3d 261, 265 (9th Cir.1995).

■ On legal questions involving interpretation of the National Labor Relations Act, we defer to the NLRB's reasonable interpretation. *Allentown Mack*, 118 S.Ct. at 822.

## IV

### Access to Jobsites

■ Under § 7 of the Act, employees have a right to "self-organiz[e], to form, join, or assist labor organizations." 29 U.S.C. § 157 (1994). The § 7 right necessarily implicates a right to "learn of the advantages of self-organization from others." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113, 76 S.Ct. 679, 100 L.Ed. 975 (1956). In extreme cases, the employees' § 7 right can compel an employer to permit non-employee union organizers to access its property for organizational purposes. *See id.* at 112. This narrow exception to an employers' property right to exclude others from its property applies where the employees "are isolated from the ordinary flow of information that characterizes our society," such that " 'the inaccessibility of employees makes ineffective the reasonable attempts by non-employees to communicate with them through the usual channels.' " *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 537, 540, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992) (quoting *Babcock*, 351 U.S. at 112, 76 S.Ct. 679).

The *Lechmere* Court gave the Board's order in *Alaska Barite Co.*, 197 NLRB

1023, 1972 WL 4576 (1972), *enforced mem.* 83 LRRM 2992, 1973 WL 3155 (9th Cir. 1973), as an example of a situation where a union must be granted a right of access. In *Alaska Barite,* the employees resided at a company camp on an island off the coast of Alaska, near the Alaskan town of St. Petersburg. *Id.* at 1024. Although most employees spent the weekends in St. Petersburg, during the work week the employees stayed in camp. *Id.*

Relying on *Alaska Barite,* the Board decided *Husky Oil N.P.R. Operations, Inc. v. International Teamsters Local 959,* 245 NLRB 353, 1979 WL 9960 (1979), *enforced,* 669 F.2d 643 (10th Cir.1982). In *Husky Oil,* the employees lived in an employer-owned camp on the North Slope during their hitches. 245 NLRB at 354. They had access to televisions, which played tapes of regular broadcasts from Anchorage stations, and received intermittent radio signals on two channels. *Id.* Mail was available through the employer, and one public telephone was available in the camp. *Id.* The Board held that the employer committed an unfair labor practice in violation of § 8(a)(1) by refusing the union access to the camp. 245 NLRB at 356.

██ We view *Husky Oil* as directly on point. The only principled difference is the greater difficulty that the union in *Husky Oil* encountered in contacting employees in the Anchorage Airport in that case: "R&R schedules are sometimes changed, weather conditions interfere with plane schedules, employees are often anxious to meet their families, and only three or four employees in the proposed bargaining unit land there each week." *Husky Oil,* 669 F.2d at 647. In the case at bench, by contrast, all evidence points to regular flights and the Union's consequent ability to contact Nabors' employees before they leave for the North Slope. However, evidence also indicated that these efforts were limited by the difficulty of arranging a meeting room and the difficulty of singling out Nabors' employees from the group waiting for the oil company charter.

██ Nabors asserts that the Supreme Court's *Lechmere* decision rendered *Husky Oil* invalid. We disagree. First, *Husky Oil* relied on *Alaska Barite,* which the Supreme Court expressly approved in *Lechmere,* 502 U.S. at 539, 112 S.Ct. 841. Second, Nabors reads the *Lechmere* rule too narrowly, arguing: "[A] union must prove it has not even one alternative means of communicating its message to employees." (citing *Oakland Mall,* 316 NLRB 1160, 1995 WL 220095 (1995)).[2] Neither *Lechmere* nor the Board's interpretation of *Lechmere* in *Oakland Mall* is susceptible to such a narrow reading. Rather, unless the Union has "reasonably effective" means of communicating with Nabors' employees, access may be required. *Lechmere,* 502 U.S. at 538, 112 S.Ct. 841; *Oakland Mall,* 316 NLRB at 1163 (inquiring whether "the General Counsel has proven that the Union had no reasonable alternative means" of expressing its message).

In the instant case, the ALJ found, and the Board affirmed, that the Union did not have reasonably effective means of communicating with Nabors' employees short of accessing Nabors' jobsites for organizational purposes, a factual finding which we review for substantial evidence, *see Husky Oil,* 669 F.2d at 648. We conclude after review of the entire record that substantial evidence supports the finding.

## V

### Discriminatory Discharge

██ An employer commits an unfair labor practice in violation of § 8(a)(1) & (3) if it discharges an employee because of the employee's union activity. *Wright Line, a*

---

**2.** *Oakland Mall* is arguably inapplicable because, in that standards picketing case, the NLRB considered the "attenuated ... Section 7 right" to communicate with the store's customers about its dispute with the employer.

316 NLRB at 1163. However, we need not reject its applicability to the instant case because we conclude that Nabors overstates the Board's holding.

*Div. of Wright Line, Inc. v. Lamoureux,* 251 NLRB 1083, 1083, 1980 WL 12312 (1980). Where a dual motive for the termination might exist, we follow the Board's burden-shifting analysis. *Blaylock Elec. v. NLRB,* 121 F.3d 1230, 1233 (9th Cir.1997) (wrongful refusal to hire) (citing with approval *Wright Line,* 251 NLRB 1083). The General Counsel first bears the burden to make a prima facie showing that unlawful discrimination was a motivating factor in the employer's termination decision. *Wright Line,* 251 NLRB at 1088. The burden then shifts to the employer to prove that legitimate reasons supported the termination. *Id.; see Dash v. NLRB,* 793 F.2d 1062, 1066 (9th Cir.1986) (characterizing the employer's burden as an affirmative defense).

▌ The employer can fulfill its burden by demonstrating that facts discovered after termination gave rise to a legitimate basis for discharge, even if the employee was originally fired for an improper reason. *Tel Data Corp.,* 315 NLRB 364, 367, 1994 WL 591743 (1994); *John Cuneo, Inc. v. Road Sprinkler Fitters Local 669,* 298 NLRB 856, 856, 1990 WL 122500 (1990). When an employer makes its *Tel Data* showing, a back-pay remedy is only available up to the time when the employer learned of the proper reason for termination, *Marshall Durbin Poultry Co. v. NLRB,* 39 F.3d 1312, 1317 (5th Cir.1994), and reinstatement is not ordered. *Tel Data,* 315 NLRB at 367.

## A

### General Counsel's Showing

▌ The core of Nabors' contention that substantial evidence did not support the Board's conclusion is that Buzby made the decision to terminate Anderson and Couture, and that no evidence suggests that Buzby had anti-union animus. Therefore, Nabors argues, any anti-union animus that Nabors' management harbored could not have motivated the decision to terminate Anderson and Couture.

However, substantial evidence does support the Board's conclusion that the General Counsel met its burden of proving anti-union animus. First, evidence that the ALJ specifically credited indicates that Wilson, not Buzby, made the decision to terminate Anderson and Couture. Couture, Anderson, and Martin all testified that Buzby told Anderson and Couture they could return to work if they passed a drug test. Even under Buzby's version of the events—where Buzby made the termination decision—he had spoken with Wilson twice before firing Anderson and Couture.

Second, evidence indicated that Wilson possessed anti-union animus. She was part of the management team that conducted a vigorous anti-union campaign leading up to the election. Wilson was involved in the termination of Pearson, which Nabors does not contest constituted an unfair labor practice. Nabors also does not contest that Wilson was involved in surveillance of the Union's organizing campaign at the airport.

Third, two other employees who tested positive for marijuana use were terminated but remained eligible for rehire. In contrast, Wilson informed Anderson and Couture, and testified at the hearing, that Anderson and Couture could not be rehired. Although Wilson testified that Nabors' drug-testing policy differentiated between being caught using drugs on the job and merely testing positive, nothing in the text of the policy[3] or past implementation

---

**3.** Nabors' policy, as quoted in the ALJ's findings of fact, reads in pertinent part:

Employees involved in an industrial accident wherein drug or alcohol use is a suspected factor, shall be required to undergo a urinalysis screening. This screening shall be conducted as soon as practical after the accident. If drug or alcohol use is detected, the employee shall be suspended from employment pending a complete investigation of the accident.

Employees suspected of using controlled substances and/or alcohol shall be required to undergo the urinalysis process. Report of usage or observations of impaired performance may be grounds for requesting that an employee be administered the urinalysis.
* * *

supported Wilson's testimony. Rather, all indication is that Nabors failed to follow its own policy with regard to Anderson and Couture. Substantial evidence supports the Board's finding that the General Counsel met its initial *Wright Line* burden of demonstrating that Anderson's and Couture's discharge violated § 8(a)(1) & (3).

## B

### Nabors' Showing

 Nabors contends that it met its consequent burden of proving that Anderson and Couture would have been terminated despite their pro-union activity. We agree. Although the ALJ properly concluded that Anderson's and Couture's urinalysis test results were irrelevant to the question of the legality of their discharge, she erred as a matter of law when concluding: "Given the Respondent's position that the employees were discharged regardless of the results of the tests, I find irrelevant both the results and validity of these tests and subsequent tests procured by Anderson and Couture." Rather, the results of the tests taken by Anderson and Couture were relevant to the question of Nabors' possible after-acquired legitimate basis for discharge. *See Tel Data,* 315 NLRB at 367 ("Although the judge was correct in finding that the timecard incident is not relevant to the issue of whether Frederick was unlawfully discharged, the Respondent's evidence nonetheless must be considered in determining whether Frederick is entitled to reinstatement and full backpay.").

We thus hold that the Board erred in the extent of remedy ordered in the second case. On remand, the Board must consider a remedy fitting the following framework: Couture and Anderson are entitled to backpay up to the time when Nabors learned of a legitimate reason for discharging them based on the clear meaning of Nabors' drug-testing policy. Nabors acquired a legitimate basis for discharge at the earliest time that Nabors was aware of Couture's and Anderson's failure to pass their urinalysis tests. Couture and Anderson are then eligible for rehire in a manner consistent with the clear meaning of Nabors' drug-testing policy, which makes them eligible for rehire 90 days after the legitimate basis for their discharge was discovered.

## VI

Because the Board's factual findings are supported by substantial evidence, we grant the Board's cross-petition for enforcement in the access case. In the discharge case, although the Board's findings are supported by substantial evidence, we hold that the Board erred as a matter of law when failing to consider Couture's and Anderson's failure to pass their urinalysis tests in the determination of the remedy. We thus remand for a re-determination of remedy consistent with this opinion.

Petition for review DENIED in part, GRANTED in part, and REMANDED. Cross-petition for enforcement GRANTED in part, DENIED in part, and REMANDED.

---

Employees with a "positive" urine sample will be immediately suspended and removed from the jobsite. The remaining urine specimen of the employee involved shall be transported to an appropriate laboratory for confirmation of the analysis. Chain of custody of the specimen shall be maintained at all times.

If the laboratory confirms the "positive" analysis the employee shall be terminated from employment with Nabors Alaska Drilling, Inc. and will not be considered for rehire for a period of 90 days.