**LECHMERE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 89–1683.**

United States Court of Appeals, First Circuit.

Heard Jan. 10, 1990.

Decided Sept. 17, 1990.

Rehearing and Rehearing En Banc Denied Oct. 25, 1990.

---

Robert P. Joy, with whom Keith H. McCown and Morgan, Brown & Joy, Boston, Mass., were on brief, for petitioner.

Richard A. Cohen, Atty., with whom Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Supervisory Atty., Washington, D.C., were on brief, for respondent.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

This matter is before us on an employer's petition to review an order of the National Labor Relations Board and a cross application for enforcement. The case raises significant questions concerning the balance which must be struck in the workplace between employers' private property rights and workers' rights of self-organization. We uphold and enforce the order of the Board.

## I. STATEMENT OF THE CASE

### A

The events giving rise to this litigation occurred in Newington, Connecticut. Newington is a suburb of Hartford. The relevant metropolitan area (Greater Hartford) includes at least three cities (Hartford, Newington, New Britain) and close to 900,-000 people. The employer, Lechmere, Inc. (Lechmere), is a Massachusetts corporation which operates a chain of retail stores throughout New England. These emporia sell a wide range of "hard goods," including appliances, audio/video equipment, housewares, and sporting paraphernalia. In 1986, Lechmere opened a store in Newington, situated on a roughly rectangular parcel of land approximately 880 feet from north to south and 740 feet from east to west. The tract, commonly called the Lechmere Shopping Plaza, is bounded on the east by a major thoroughfare, the Berlin Turnpike, and on the north by Pascone Street.

Lechmere's store is the dominant structure on the site and stands at the south end of the rectangle. On the west side are 13 smaller shops owned by Newington Commercial Associates Limited Partnership (NewCom), an unrelated entity. Two public pay telephones are located in front of this shopping strip. In June 1987, only four satellite stores were open for business.

The Plaza's parking areas are in servitude to all of the mercantile establishments. There are no signs purporting to restrict access to, or use of, the parking spaces; no stores have exclusive parking privileges; patrons or employees of any merchant may park anywhere. The primary parking lot (PPL) lies north of Lechmere's store and extends to Pascone Street. The satellite stores face the PPL. A smaller parking lot, more distant from the shopping strip, is situated to the east of Lechmere's store. Ownership of the real estate is divided between Lechmere and NewCom.

A grassy apron approximately 46 feet wide runs the entire length of the property along the Berlin Turnpike. The only breaks in that apron are for ingress to, and egress from, the shopping center. Most of that apron is public property. The remainder of the apron—the four foot strip furthest from the highway—is owned by Lechmere. At the main entrance, the grass continues in a westerly direction for approximately 50 feet on the north side only. Lechmere owns this patch. It also owns the land occupied by, and immediately surrounding, its store. NewCom owns the land occupied by, and immediately surrounding, the shopping strip. The remainder of the parcel, including most of the parking area, is owned jointly by Lechmere and NewCom.

There are three entrances to the property. The principal ingress is from the Berlin Turnpike, providing easy access to Lechmere's establishment and the strip stores. At this entrance, a directory-type sign identifies two of the stores in the shopping center as "Lechmere" and "Card Gallery." A second ingress route runs off Pascone Street, north of Lechmere's store and east of the shopping strip. This entrance faces the front of Lechmere's store and, like the main entrance, feeds into the PPL. Finally, there is a delivery entrance at the southernmost end of the property, running from the Berlin Turnpike to a loading dock behind Lechmere's building.

The public can enter the Lechmere store at one of two points. The principal doorway, facing north, is directly accessible from the PPL. The secondary door, on the store's east side, fronts a vehicular pick-up area. Lechmere employees who drive to work are instructed to use this entrance. They are also asked to park in the easternmost portion of the PPL, that is, in the spaces closest to the Berlin Turnpike. On each set of doors to Lechmere's premises are 6" × 8" signs stating: "TO THE PUBLIC. No Solicitation, Canvassing, Distribution of Literature or Trespassing by Non-Employees in or on Premises."

Lechmere's no-solicitation policy is reduced to writing and has been in effect since 1982. It states:

Solicitation of associates [*i.e.*, employees] in the work areas during working time is

strictly prohibited. It is strictly prohibited in all selling and public areas at all times. Non-working time includes break periods, meal periods and other specified periods during the work day when associates are properly not engaged in performing their work tasks.

Distribution of literature in work areas and public selling areas is prohibited.

Non-associates are prohibited from soliciting and distributing literature at all times anywhere on Company property, including parking lots. Non-associates have no right of access to the non-working areas and only to the public and selling areas of the store in connection with its public use.

Historically, the no-solicitation policy has applied to the store and the parking lots. It has been strictly enforced. Various groups, including the American Automobile Association, the Salvation Army, and the Girl Scouts, have from time to time been prevented from soliciting on the premises.

## B

In mid-1987, Lechmere had roughly 200 employees in Newington, all non-union. Beginning on June 16 of that year, Local 919 of the United Food and Commercial Workers (the union) placed a series of five advertisements in the Hartford Courant, a daily newspaper, in an attempt to organize Lechmere's work force. The advertisements each contained a replica of a union authorization card captioned "mail today" or "mail it now." On one occasion, the ad consisted of a flyer distributed in conjunction with the newspaper. Given the Courant's limited penetration of the populous suburban area—it was delivered to fewer than 100,000 subscribers daily—and the fact that Lechmere systematically removed the ads from newspapers delivered to its

Newington store, there is no particular reason to believe that many of the affected employees actually saw the ads.

On June 18, nonemployee union organizers started leafleting cars in the PPL, concentrating on the east side, thinking that a high percentage of these vehicles belonged to employees. Petitioner's assistant manager asked the organizers to leave and petitioner's security guards removed the pamphlets. A brochure which had been handed to an employee was confiscated by a guard. On two other occasions, handbilling sorties were aborted in a similar manner.

On the morning of June 20, union organizers, not part of Lechmere's work force, stood on the grassy apron, within a few feet of the Berlin Turnpike, in effect bracketing the main entrance. They attempted to distribute handbills to cars entering the PPL, assuming that, because of the early hour, the intended recipients were employees. A cadre of Lechmere officials responded; the general manager, various supervisors, and three security guards emerged from the store and confronted the union representatives. The manager told the organizers that they were on Lechmere's property and insisted that they leave. He threatened to call the police if they did not comply. Contending that they were on public land, the organizers refused to depart. Petitioner made good its threat.[1] On arrival, the police officers questioned the organizers, confirmed that they were on public property, and allowed them to continue their activities. At the same time, the police observed that the organizers were dangerously close to the highway and warned them against obstructing traffic flow. Because Lechmere's security guards were videotaping their movements, the union representatives departed.[2]

---

**1.** The testimony of Lechmere's manager as to when he called the police contained inherent contradictions. As a result, the administrative law judge chose to credit the testimony of the union representatives over that of the manager. There is no valid basis for us to disturb reasonable credibility judgments of this kind. See, e.g., NLRB v. Horizon Air Servs., Inc., 761 F.2d 22, 27 (1st Cir.1985) (discussing court's obli-

gation to defer to the Board's credibility determinations); Rikal, Inc. v. NLRB, 721 F.2d 402, 406 (1st Cir.1983) (similar).

**2.** Although it was alleged that videotaping constituted illegal surveillance in violation of 29 U.S.C. § 158(a)(1), the Board dismissed this charge. No appeal has been taken from that aspect of the Board's decision and we do not

From August 7 through September 5, the union picketed Lechmere, regularly stationing personnel on the public portion of the grassy apron. During the next six months, intermittent picketing took place. The union also scanned the license plates of cars parked in the general area where employees had been told to park, and checked the information obtained with the Connecticut Department of Motor Vehicles. Notwithstanding these efforts, the union was only able to secure the names and addresses of 41 nonsupervisory Lechmere employees. Making what use it could of this information—nearly half of the 41 persons proved to have unlisted telephone numbers—the union tried to call or visit a good many of these workers. Several were high school students whose parents barred union organizers from talking to them. Four mailings to the contingent produced only one signed authorization card.

### C

The union filed unfair labor practice (ULP) charges on July 21, 1987. After an evidentiary hearing before an administrative law judge (ALJ), it was concluded that Lechmere violated Section 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), in two ways: (1) by refusing to allow representatives of Local 919 to engage in organizational activity on company property, and (2) by attempting to remove union representatives from a public area adjacent to company property. Following the Board's issuance of a suitable remedial order (the terms of which are not challenged), the present proceeding materialized.[3]

### II. THE BOARD'S ROLE

It is undisputed that "the N.L.R.B. has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.,* —— U.S. ——, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990). Given the Board's "special competence" in the field of labor relations, *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975), and its vital role in administering the Act, we accord considerable deference to its views. *See Curtin Matheson,* 110 S.Ct. at 1549. This deference extends to the Board's factual determinations, so long as they are supported by substantial evidence on the record as a whole. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Horizon Air Servs., Inc.,* 761 F.2d 22, 25 (1st Cir.1985); *see also* 29 U.S.C. § 160(e).

The Board's application of law to fact is reviewed under substantially the same standard. *See NLRB v. United Ins. Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Thus, the Board's resolution of a mixed question of fact and law is worthy of deference and must be honored so long as the resolution is factually reasonable, that is, founded upon substantial evidence, and legally sound. *See NLRB v. Hearst Publications,* 322 U.S. 111, 130–31, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944); *Boston Univ. Chapter, AAUP v. NLRB,* 835 F.2d 399, 401 (1st Cir.1987). As to inferential and deductive constructs which the Board employs to assist it in answering mixed fact/law questions, courts should uphold the Board's approach as long as it is rational and consistent with the Act. *See Curtin Matheson,* 110 S.Ct. at 1549; *Destileria Serrales, Inc. v. NLRB,* 882 F.2d 19, 21–22 (1st Cir.1989); *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 22–23 (1st Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). Because it is the Board which, over time,

---

address it here. Matters raised before the agency, but not briefed on appeal, are waived. *See, e.g., Consumers Union v. FPC,* 510 F.2d 656, 662 & nn. 9, 10 (D.C.Cir.1974); *see also Marin Piazza v. Aponte Roque,* 909 F.2d 35, 37 (1st Cir.1990) (discussing preclusive effect of Fed.R.App.P. 28(a) in analogous circumstances).

3. The Board adopted the ALJ's factual findings, including credibility determinations. Accordingly, we henceforth refer to the ALJ's findings as the Board's. *See Local Union No. 25, Teamsters v. NLRB,* 831 F.2d 1149, 1151 n. 1 (1st Cir.1987); *NLRB v. Horizon Air Servs., Inc.,* 761 F.2d 22, 24 n. 1 (1st Cir.1985). In our view, the ALJ's factual findings are fully consonant with 29 U.S.C. §§ 160(e), (f).

must adapt the Act to the changes that suffuse industrial life, the Board's chosen decisional model is entitled to judicial respect even if it represents a departure from prior policy. *Curtin Matheson,* 110 S.Ct. at 1549. Put another way: "To hold that the Board's earlier decisions froze the development of [an] important aspect of the national labor law would misconceive the nature of administrative decision making." *J. Weingarten,* 420 U.S. at 265–66, 95 S.Ct. at 968.

While the standard of review is unarguably deferential—so long as the Board's conclusion derives plausibly from the record, we may not reverse it simply because we, unencumbered, would have reached a different result—deference does not imply that courts should rubber-stamp the Board's decisions. *See id.* at 266, 95 S.Ct. at 968. Matters of law are, of course, subject to plenary review. *See, e.g., United States v. Singer Mfg. Co.,* 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963). Furthermore, a reviewing court is obliged to set aside the Board's findings of fact, notwithstanding the deference due, when the evidence, "tak[ing] into account whatever in the record fairly detracts" from the proof on which the Board relies, is not adequate to sustain the conclusion drawn. *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464. Evidence which is vague or entropic cannot be palmed off as "substantial" under the guise of respect for the agency's determinations. The key is the reasonableness of the Board's findings, judged in light of the entire record. *See, e.g., Penntech,* 706 F.2d at 23; *Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1073 (1st Cir. 1981).

## III. THE FIRST UNFAIR LABOR PRACTICE

### A

Section 7 of the Act, 29 U.S.C. § 157, guarantees employees the right to self-or-

ganization.[4] Section 8(a)(1), 29 U.S.C. § 158(a)(1), prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of [Section 7] rights." Experience teaches that "[t]he right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others." *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 113, 76 S.Ct. 679, 685, 100 L.Ed. 975 (1956). Such "others" are, typically, unions and union organizers. Although the Section 7 right is the workers' right, not the union's right, unions and their agents, derivatively, enjoy the protection of Section 7. *See Sears, Roebuck & Co. v. San Diego Dist. Council of Carpenters,* 436 U.S. 180, 206 n. 42, 98 S.Ct. 1745, 1762 n. 42, 56 L.Ed.2d 209 (1978); *Central Hardware Co. v. NLRB,* 407 U.S. 539, 542, 92 S.Ct. 2238, 2240, 33 L.Ed.2d 122 (1972); *Emery Realty, Inc. v. NLRB,* 863 F.2d 1259, 1264 (6th Cir.1988); *see also Thomas v. Collins,* 323 U.S. 516, 533–34, 65 S.Ct. 315, 324, 89 L.Ed. 430 (1945) (addressing the "necessarily correlative ... right of the union, its members and officials ... to discuss with and inform ... employees concerning" choices anent unionization).

The prerogatives conferred by Section 7 are important, but not absolute. If an effort to further Section 7 rights conflicts with other, equally solemn rights, the law demands a reasonable accommodation. One situation which frequently sets competing rights on a collision course occurs when a union's game plan for mounting an organizational campaign involves trespass, thus encroaching on an employers' property rights. In such straitened circumstances, the adjudicatory task is to strike an equitable balance "between employees' § 7 rights and employer's property rights ... 'with as little destruction of one as is consistent with the maintenance of the other'." *Hudgens v. NLRB,* 424 U.S. 507, 521, 96 S.Ct. 1029, 1037, 47 L.Ed.2d 196 (1976)

---

**4.** Section 7 provides in pertinent part:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.... 29 U.S.C. § 157.

(quoting *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684). The task is often more easily stated than achieved.

### B

The seminal case in this murky corner of the law is *Babcock*. There, a manufacturing concern owned and operated a fenced 500–employee plant on a 100–acre tract in a predominantly rural area near a community of approximately 21,000 people. About 40% of the employees dwelt in the nearby town, while the rest lived within a 30–mile radius. The plant's parking lot could be reached only by a 100–yard–long driveway, entirely on the employer's property. A 31–foot public right-of-way extended from the highway and intersected the driveway at one point. This junction was the only public place in the immediate vicinity of the plant at which leaflets could be distributed to employees, but safety considerations made any such distribution "practically impossible." 351 U.S. at 107, 76 S.Ct. at 681. The union used the mails to communicate with over 100 employees, visited some homes, and talked to some employees by telephone. Dissatisfied with the results, union organizers, none of whom were employees, tried handbilling in the parking lot. The company had, and enforced, a comprehensive no-solicitation policy prohibiting such activity by nonemployees on company grounds. Applying this policy, it banned the organizers.

The Board ruled that Section 8(a)(1) had been infracted. The court of appeals disagreed, 222 F.2d 316 (5th Cir.1955), as did the High Court. Justice Reed wrote that nonemployee union organizers did not enjoy the same status as employees or their invitees and could be excluded from the employer's private property if "reasonable efforts by the union through other available channels of communication w[ould have] enable[d] it to reach" the work force with its message. 351 U.S. at 112, 76 S.Ct. at 684. Since several alternative means of employee contact were available—alternatives which would likely be effective since a large proportion of the employees were easily accessible outside of working hours,

*id.* at 113, 76 S.Ct. at 685—the employer's right to exclude nonemployees from its property need not yield to permit the dissemination of organizational information by trespassory means. *Id.* at 112–13, 76 S.Ct. at 684. Put another way, the company could deny nonemployees the right to distribute union literature in the plant parking lot because the employees, though deprived of the benefits of handbilling, were not "beyond the reach of reasonable union efforts to communicate with them". *Id.* at 113, 76 S.Ct. at 685.

In *Hudgens*, the Court reaffirmed that the extent of the necessary accommodation rested largely "on the nature and strength of the respective § 7 rights and private property rights asserted in any given context"; and that allowing trespassory access to private property, or not, depends upon a reasoned assessment and weighing of the interests involved and the availability of alternative means of communication. 424 U.S. at 522, 96 S.Ct. at 1037.

In *Sears*, the Court held that a state court could entertain an employer's state-law trespass claims against union representatives engaged in area standards picketing. 436 U.S. at 207–08, 98 S.Ct. at 1762–63. In discussing whether the state-law claims were preempted, the Court explained that, unlike organizational picketing, "[a]rea-standards picketing ... has no ... vital link to the employees located on the employer's property." *Id.* at 206 n. 42, 98 S.Ct. at 1762 n. 42. Thus, "[e]ven ... [if] ... picketing to enforce area standards is entitled to the same deference in the *Babcock* accommodation analysis as organizational solicitation, it would be unprotected in most instances." *Id.* 436 U.S. at 206, 98 S.Ct. at 1762 (footnote omitted). *Sears*, then, highlighted the strength of the Section 7 right as a critical factor in the equation. While the right asserted in *Sears* itself—area standards picketing at a remote locus—was relatively weak, the *Sears* Court was careful to note, in dicta, that the right to organize without employer interference is a heartier Section 7 right,

lying at "the very core" of the Act. *Id.* at 206 n. 42, 98 S.Ct. at 1762 n. 42.[5]

## C

Over the years, the Board has made several efforts to formulate a workable standard around the dictates of *Babcock* and its progeny. Its most recent attempt is contained in *Jean Country*, 291 N.L.R.B. No. 4 (Sept. 27, 1988). Petitioner argues that the balancing test articulated in *Jean Country*, applied here by the Board to petitioner's detriment, does violence both to *Babcock* and to the Act. In addressing Lechmere's argument, we must determine whether the Board's elaboration in *Jean Country* constitutes a reasonable construction of the Act in light of the "changing patterns of industrial life," *J. Weingarten*, 420 U.S. at 266, 95 S.Ct. at 968; and if so, whether the Board's calibration of competing rights in this case passes the substantial evidence test.

In *Jean Country*, the Board observed initially that "there is a 'spectrum' of Section 7 rights and private property rights and ... the place of a particular right in that spectrum might affect the outcome of a [given] case." *Jean Country, supra*, at 8. That is familiar lore. *See Hudgens*, 424 U.S. at 522, 96 S.Ct. at 1037; *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684. The Board indicated that, in developing shadings along the spectrum, it will typically not be enough merely to collect information defin-

ing the nature and strength of the competing rights in a particular situation. A third bundle of information will also be needed, pertaining to the "availability of reasonably effective alternative means" of communication. *Jean Country, supra*, at 9. The Board characterized its "essential concern" as "the degree of impairment of the Section 7 right if access should be denied, as it balances against the degree of impairment of the private property right if access should be granted," factoring in "the availability of reasonably effective means." *Id.*

The Board forecast that, "in cases when a property owner has especially compelling reasons for barring access and when the Section 7 right is less central than, for example, the right of employees to organize ... we may more readily find that means of communication other than those entailing entry onto the property in question constitute a reasonable alternative." *Id.* at 8. Conversely, if a particular property right is diluted, as "when property is open to the general public" and some "more private character has [not] been maintained," it becomes more likely that other alternatives will be found unsatisfactory and a denial of access found unlawful. *Id.* at 10. The Board wisely disclaimed any mechanical formula, *id.* at 9–10, offering instead a compendium of factors which might prove relevant in assessing the contents of the various informational bundles.[6]

---

**5.** To be sure, the Court also noted, again in dicta, that union assertions of the right to trespass for organizational purposes have "generally been denied except in cases involving unique obstacles to nontrespassory methods of communication with the employees." *Sears*, 436 U.S. at 205–06 n. 41, 98 S.Ct. at 1762 n. 41. Lechmere interprets this statement to mean that a heavy presumption exists in favor of property rights over Section 7 rights. We do not agree. Rather, we believe the Court meant merely to reinforce the idea that the burden of proving a lack of reasonable alternative means of communication rests with the trespasser. Absent a showing, based upon objective criteria, that such means are futile or likely not to exist, a union's assertion of access rights will probably be denied.

**6.** These included: (1) as to the employer's property right, the nature of the interest, the use to

which the property is put, any restrictions that are imposed on public access to it, and the property's relative size and openness, *Jean Country, supra*, at 8; (2) as to the employees' Section 7 right, the nature of the right, the identity of the employer to whom the right is directly related, the relationship of the employer to the property, the identity of the audience to which the communication concerning the Section 7 right is directed, and the manner in which the activity related to that right is carried out, *id.;* and (3) as to alternative means, the safety of attempting communications at alternative sites or in other ways, the desirability of avoiding enmeshment of neutrals, and the extent to which use of communication alternatives, to the exclusion of trespassory conduct, would dilute the effectiveness of the union's message, *id.* at 8–9.

■ This elaboration constitutes a plain recognition by the Board that it must gather the three interdependent bundles of facts just described—strength of employees' Section 7 right, strength of employer's property right, availability and efficacy of alternative means of communication—tie them together, and weigh them in the aggregate. We find this approach to the accommodation of competing interests consistent with *Babcock* and in tune with the Act. In our judgment, *Jean Country* states a permissible view of the law and affords a useful analytic model for resolution of access-to-property cases. We are reinforced in our assessment by the District of Columbia Circuit's recent holding that "[t]he elaboration ... advanced in *Jean Country* ... sensibly construes the Act in light of High Court precedent in point." *Laborers' Local Union No. 204 v. NLRB*, 904 F.2d 715, 718 (D.C.Cir.1990); *see also Emery Realty*, 863 F.2d at 1264 (citing *Jean Country* with approval). Since *Jean Country* is a "reasonable interpretation of the Act," *NLRB v. City Disposal Systems*, 465 U.S. 822, 841, 104 S.Ct. 1505, 1516, 79 L.Ed.2d 839 (1984), melding harmoniously with binding precedent, we accept the Board's reliance on it.[7]

### D

■ Lechmere contends that, even if *Jean Country* comprises a reliable explication of the law, the Board incorrectly applied it in this case. As a corollary matter, Lechmere also contends that the Board's findings fail the substantial evidence test.

We look to the record and to the Board's analysis. It is beyond serious question that the Section 7 interest of the company's employees in receiving organizational information from the union was robust, implicating what the *Sears* Court, 436 U.S. at 206 n. 42, 98 S.Ct. at 1762 n. 42, called a "core" Section 7 right. Lechmere's property right was not quite as strong. On the one hand, petitioner was a co-owner of the parking lot, used it for business purposes, and followed a stringent no-solicitation policy. On the other hand, petitioner's property interest was diluted by the public nature of the parking lot and the nonexclusivity of its use. Moreover, the Board found, and the record abundantly supports, that the planned organizational activity did not interfere with normal use of the PPL, disrupt Lechmere's business, constitute harassment, or impede traffic flow.[8] All in all, we cannot fault the Board's determination that the property right here at issue, though "relatively substantial," did not serve to "diminish the strength of the core Section 7 right asserted."

The Board also found that, unless effective alternative means of communicating the organizational message existed, the Union's Section 7 right would be so "severely impaired" as to be "substantially destroyed." Such a premise is consistent with the Court's statement that "when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize." *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684. Thus, when the Section 7 interest is powerful, the *Babcock* accommodation anchors the necessity of trespass rather firmly to the unavailability of other reasonably efficacious means of communicating with the

---

7. The dissent argues that *Jean Country* is entitled to less than the usual deference because it represents a change in policy. As we have previously recognized, however, an agency is not shackled by its prior precedents if it explicitly acknowledges that it is departing and offers a principled rationale for its departure. *See Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 36 (1st Cir.1989). In the present case, we think the Board has adequately fulfilled our criteria.

8. We have reviewed the employer's proffer of evidence that union representatives occasionally entered the store itself. We believe that the Board, in its discretion, reasonably rejected the proffer on relevancy grounds. The only issue presented in this case was whether the company lawfully denied the union access to the parking areas for handbilling purposes. The Board's order does not in any way foreclose petitioner from continuing to bar distribution of leaflets by nonemployees within the store proper.

desired audience.[9]

This brings us to the crux of the dispute: whether the union had open to it other effective means of reaching Lechmere's work force with its organizational message. The devoir of persuasion rested with the union. *See Sears,* 436 U.S. at 205, 98 S.Ct. at 1761; *Jean Country, supra,* at 7. The Board determined that the burden had been met: "there [were] no reasonable, effective alternative means available for the Union to communicate its message to the [company's] employees." Petitioner's current assault requires that we probe the multifaceted calculus of alternative means in order to explain why we do not regard this determination as undeserving of deference.

Of course, there is no surefire litmus test which can reveal, unfailingly, whether available communicative means are reasonably effective alternatives to trespassory handbilling in a given situation. Be that as it may, the lowest common denominator of the alternative means calculus necessarily reduces to objective reasonableness. *See Jean Country, supra,* at 7 (showing of ineffectiveness must be "based on objective considerations, rather than subjective impressions"). Reasonableness expands and contracts: the rights at issue, and the particular circumstances, color its definition whenever alternative means are examined. After all, the Court made clear in *Hudgens* that both Section 7 rights and property rights exist along a continuum. 424 U.S. at 522, 96 S.Ct. at 1037. The strength and nature of these rights will "inform the analysis of whether a union has reasonable alternative means to reach the targets of its section 7 activity." *Laborers' Local,* 904 F.2d at 718. Thus, the expansiveness of "reasonable alternative means" will vary inversely with the strength and nature of the Section 7 right asserted and will vary directly with the strength and nature of the private property right asserted. Because reasonableness is a concept, not a constant, *cf. Sierra Club v. Secretary of the Army,* 820 F.2d 513, 517 (1st Cir.1987) (reasonable-

ness is "a mutable cloud, which is always and never the same") (paraphrasing Emerson), determinations of reasonableness are, in this environment, *sui generis.*

These principles are especially important in distinguishing *Babcock* from the case at hand. Although the strength of the Section 7 right in the two cases seems equal— indeed, the right at issue is substantially identical—the property right asserted in *Babcock* was significantly stronger than that asserted here. In *Babcock* itself, the factory was the only building on a large, secluded tract; as a manufacturing facility, it was not open to the public or any other regular influx of invitees; the surrounding area was rural; the employees, while inaccessible at work, were relatively accessible to union organizers off hours, since virtually all the employees lived within 30 miles of the plant and there was only one community of any size in the vicinity; and more than 90% of the employees drove to work in private automobiles and parked in a private company lot, using a driveway which only served the employer's premises. Significantly, there was no allegation that the union did not know, or would have difficulty absent trespassory solicitation in ascertaining, the workers' identities. These circumstances required a finding that the employees were "in reasonable reach" by methods short of trespassory handbilling. *Babcock,* 351 U.S. at 113, 76 S.Ct. at 685. In a small-town setting, readily identifiable workers were open to other reasonable alternatives such as "us[ing] personal contacts on streets or at home, telephones, letters or advertised meetings to get in touch with the employees." *Id.* at 111, 76 S.Ct. at 684.

The situation at bar presents some meaningful differences. Unlike in *Babcock,* the Board found that Lechmere's employees are not easily accessible or identifiable. Unlike in *Babcock,* Lechmere's work force is drawn from a much more populous area and reports to work at a place where it is

---

**9.** The anchor may be dropped differently in cases where the employer's access rules single out, and discriminate against, union activity. *See, e.g., Sears,* 436 U.S. at 205, 98 S.Ct. at 1761.

Here, however, we are not dealing with discriminatory access rules. Lechmere's no-solicitation policy was enforced impartially.

difficult to discern the targeted audience from the multitude of shoppers and persons working for other businesses within the Plaza.

The Board's other findings also tend to distinguish the instant case from *Babcock*. Here, the union had made a good-faith effort to explore alternative routes.[10] Although it expended considerable time and effort, the union was able to compile merely a skeletal employee roster. It had tried, and abandoned, deploying handbillers on public property—a practice which the Board found unsafe and ineffectual.[11] No other plausible method of personal contact with the majority of the work force has been suggested. The mail—a method which, by itself, has been said not to constitute an effective alternative to personal contact, *see, e.g.*, *National Maritime Union v. NLRB*, 867 F.2d 767, 773 (2d Cir. 1989); *NLRB v. Tamiment, Inc.*, 451 F.2d 794, 798 (3d Cir.1971), *cert. denied*, 409 U.S. 1012, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972)—was impracticable in this case because of the incomplete list of names and addresses. The union had tried newspaper advertising, without notable success, and the Board judged such advertising to be inutile.

■ The badges of effectiveness must be applied in a practical, common-sense way. Here, the location of the store as part of a shopping mall, the employer's unwillingness to disclose the names and addresses of workers, the workers' scattered domiciles throughout a populous metropolitan area, the union's inability to identify the vast majority of workers despite

due diligence, the absence of meaningful opportunities for face-to-face contact, and the union's failed efforts to reach the employees, all argue convincingly in favor of the Board's determination. Moreover, we think that in this instance three factors weigh heavily in the balance: (1) the lack of other feasible ways of reaching workers in person, (2) the prohibitive cost of certain other suggested alternatives, and (3) the minimally intrusive nature of the putative trespass. We comment briefly on each of these aspects.

■ First, we recognize that personal contact is an important part of any organizing effort. Whether to opt for a union, or not, is rarely a cut-and-dried proposition; there are pros and cons, the evaluation of which may be better suited to the dynamics of lively discourse than to the static impersonality of more remote approaches. Non-unionized workers are often fearful of management's reactions to the proposed introduction of a union, and personal contact is extremely useful in overcoming such timorousness. Here, the union had no other feasible way of effecting personal contact with the majority of the workers. We do not suggest that trespassory handbilling must be allowed whenever personal contact is otherwise unavailable—but we believe, nevertheless, that the absence of other opportunities for personal contact will, in the usual case, cut sharply in favor of the union. Put another way, the easier the union's access to the workers, the more likely that non-trespassory means of communication will suffice.[12]

**10.** We reject petitioner's intimation that the union must actually exhaust every conceivable means, proving it to be in fact ineffective. A good-faith effort is all that should be required. *See Emery Realty*, 863 F.2d at 1265; *Husky Oil, N.P.R. Operations, Inc. v. NLRB*, 669 F.2d 643, 645 (10th Cir.1982).

**11.** The only available strip of public property, the edge of the grassy apron, abuts the Berlin Turnpike, a four-lane highway with a speed limit of 50 m.p.h. The area is commercial in character and there are indications in the record that traffic is more than minimal. There is no traffic signal or stop sign at the entrance from the turnpike into the Plaza.

**12.** Accessibility, in this context, is dichotomous. One aspect implicates the geography of the workplace. *Cf., e.g., Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 799, 65 S.Ct. 982, 986, 89 L.Ed. 1372 (1945) (recognizing need for access to remote "mining or lumber camp where the employees pass their rest as well as their work time"); *Husky Oil, N.P.R. Operations, Inc. v. NLRB*, 669 F.2d 643, 646–47 (10th Cir.1982) (cataloging cases). The second aspect of accessibility implicates the identifiability of the work force: if the union does not know, and cannot readily learn, the names and addresses of the employees, alternative means will in many cases shrink dramatically in effectiveness. *Cf., e.g., NLRB v. Sioux City and New Orleans Barge*

■ Second, we think it is unrealistic to divorce considerations of cost from the calculus of alternative means. In theory, a union could always buy enough television time to saturate a market and thus convey its organizational message to the affected employees. Yet in the ordinary case, it would be wildly unreasonable to expect the union to embrace this extreme. Television advertising is expensive and, when addressed to a work force which comprises a tiny fraction of the viewing audience, extravagantly wasteful. Much the same can be said for many radio and newspaper advertisements. *See, e.g., NLRB v. S & H Grossinger's, Inc.*, 372 F.2d 26, 29 (2d Cir. 1967) (radio and newspaper advertising alone are not reasonable alternatives because they are expensive and relatively ineffectual). To be genuine alternatives, communicative means must be cost-effective to some degree.[13]

Petitioner makes much of the Court's observation that, in *Babcock*, "[t]he various instruments of publicity" were available to the union. *Babcock*, 351 U.S. at 113, 76 S.Ct. at 685. We do not read this single statement as meaning that the existence—whatever the cost—of mass media outlets necessarily trumps the employees' Section 7 right of self-organization. *Accord National Maritime Union v. NLRB*, 867 F.2d 767, 773 (2d Cir.1989) (pointing out that "the Court did not state that these methods, without more, provided an adequate means of communication"). In a case like *Babcock*, where the work force was clustered in and around a small town, it may well be that "instruments of publicity," say, posters at the grange hall or an inexpensive ad in a weekly newspaper, comprise reasonable alternatives. That is much less likely to be true, however, when

the work force is scattered throughout a metropolitan area like Greater Hartford.

■ The third special factor in this case does not directly implicate the alternative means calculus, but bears upon it in practical terms. We agree with other courts that in a trespassory solicitation case the extent of the union's intrusion affects whether the property right should prevail. *See, e.g., Laborers' Local*, 904 F.2d at 718 (property interest not compelling where handbilling carried out unobtrusively in parking lots which were, generally, treated as public property); *Emery Realty*, 863 F.2d at 1264 (property interest in arcade portion of shopping mall weakened by being open to public for shopping and as a route for pedestrian travel). Permitting non-disruptive or minimally disruptive trespass constitutes a much gentler accommodation than insisting that a property right yield to organizational activity which threatens the normal operations of the owner's business. *See, e.g., NLRB v. Sioux City and New Orleans Barge Lines, Inc.*, 472 F.2d 753, 756 (8th Cir.1973) (denying trespassory access where work force otherwise identifiable and access to property would substantially interfere with production). In other words, trespassory handbilling in such a situation balances the competing rights "with as little destruction of one as is consistent with the maintenance of the other." *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684.

In sum, we believe that the Board's findings, its conclusion that no other reasonably effective means of communication were open to the union, and its endorsement of Local 919's handbilling, were supportable. To be sure, the question is close—but its very closeness argues in fa-

---

Lines, Inc., 472 F.2d 753, 754 (8th Cir.1973) (denying trespassory entry where, *inter alia*, the employer "supplied the union with the names and addresses of crew members and the dates and places on which each would board or leave the boats"); NLRB v. Solo Cup Co., 422 F.2d 1149, 1151 (7th Cir.1970) (denying trespassory entry because, *inter alia*, the work force was "readily identifiable").

13. In *Jean Country*, the Board "note[d] ... generally, [that] it will be the exceptional case

where the use of newspapers, radio, and television will be feasible alternatives to direct contact." *Jean Country, supra*, at 7. The dissent says that the Board thus wove an impermissible "rule" out of "balance-tipping dogma." We think this criticism misreads the quoted statement—a statement which we see as no more than a prediction of probable outcomes in an increasingly urbanized society where use of the mass media has become more and more expensive.

vor of staying the judicial hand. The Court, after all, has left no doubt of the Board's pivotal role in performing the necessary assessment, observing that "the locus of [the] accommodation ... may fall at differing points along the spectrum ... [and] the primary responsibility for making this accommodation must rest with the Board in the first instance." *Hudgens*, 424 U.S. at 522, 96 S.Ct. at 1037. In this case, the Board had a rational basis to conclude that, absent trespassory handbilling, the employees were "beyond the reach of reasonable union efforts to communicate with them." *Babcock*, 351 U.S. at 113, 76 S.Ct. at 685. Its analysis is sufficiently record-rooted to withstand appellate scrutiny under the deferential standard which we must apply. Accordingly, the holding that Lechmere violated Section 8(a)(1) by barring union representatives from organizational activity in the shopping center's parking lot is free from legal infirmity.

### IV. THE SECOND UNFAIR LABOR PRACTICE

The second ULP focuses upon the union's attempt to use public property—the portion of the grass apron nearest the highway—as a base for distributing leaflets to motorists entering the PPL. The overarching legal principle is staunch: an employer cannot interfere with protected union activities that occur away from its premises. *See, e.g., NLRB v. Central Power & Light Co.*, 425 F.2d 1318, 1323 (5th Cir.1970); *Montgomery Ward & Co. v. NLRB*, 339 F.2d 889, 894 (6th Cir.1965); *cf. Hughes Properties, Inc. v. NLRB*, 758 F.2d 1320, 1322 (9th Cir.1985) (discussing solicitation in cafeteria on employer's property during non-working hours). In general, therefore, an employer violates Section 8(a)(1) by trying to silence nonemployee union organizers in their efforts to communicate with employees from public property adjacent to the workplace.

■ Here, the Board found, supportably, that the store manager told "the [u]nion representative[s] to leave [while] they were on public property, where they had a right to be." The manager conceded as much on cross-examination. The evidence showed that, after summoning the police, the manager insisted, wrongly, that the union organizers were trespassing. In these circumstances, and mindful of the Board's latitude in judging credibility, *see supra* note 1, the record amply supports the conclusion that Lechmere endeavored to have the police oust union representatives from the public portion of the grassy apron on the date in question, thus violating Section 8(a)(1).

In addition to challenging the Board's finding on this point, the company also attempts to confess and avoid. It argues that, even if the June 20 incident occurred as stated, it was too isolated and inconsequential to bear the weight of a ULP charge. We do not agree. Although the Board, and the federal appellate courts, have recognized that a *de minimis* principle may have some small place in unfair labor practice proceedings, *see, e.g., NLRB v. Grunwald–Marx, Inc.*, 290 F.2d 210, 210 (9th Cir.1961) (per curiam), we think such a doctrine is inapposite here. Any course of conduct, no matter how enduring or pervasive, can be broken down into tiny particles and made to seem relatively benign. But, events must be judged in context. So viewed, what transpired on June 20 cannot fairly be characterized as a single, isolated, innocuous instance of anti-union animus. Rather, it was part of an ongoing struggle between union and management, each jockeying for position as Local 919 sought to organize Lechmere's employees. As such, the Board was well within its domain in concluding that the employer's conduct, seen in the light of the record as a whole, was not within the narrow *de minimis* exception.

### V. CONCLUSION

We need go no further. For the reasons mentioned, we are persuaded that the Board's findings rest upon substantial evidence and are untainted by any cognizable error of law. Lechmere's petition for review is denied and dismissed, the NLRB's cross application is granted, and its order is

*Enforced.*

TORRUELLA, Circuit Judge (dissenting).

Paraphrasing Chief Justice Rehnquist's concurring opinion in *NLRB v. Curtin Matheson Scientific, Inc.,* ── U.S. ──, 110 S.Ct. 1542, 1554, 108 L.Ed.2d 801 (1990), "[t]he Board's ... rule [in this case] seems to me to press [past] the limit the deference to which the Board is entitled in assessing industrial reality...." This is an important case because it alters the balance of a framework carefully laid out by Congress and thoughtfully implemented by well-established Supreme Court doctrine. The issue presented here is not a new one although the standard applied by the Board in determining the commission of an unfair labor practice by Lechmere is of recent formulation. *See Jean Country,* 291 N.L.R.B. No. 4 (1988). In *Jean Country,* the Board reframed the balancing test required by the Supreme Court in the case of *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). To my view, it did so in a manner that attempts to circumvent the quintessential elements of that seminal decision.

In *Babcock & Wilcox,* as in the present case, the employer refused to permit distribution of union literature by non-employee union organizers on a company-owned parking lot. The Board found "that it was unreasonably difficult for the union organizer[s] to *reach* the employees off company property," *Babcock & Wilcox,* 351 U.S. at 106, 76 S.Ct. at 681 (emphasis added), and held that the refusal of access to the parking lot impeded the employees' right to self-organization in violation of § 8(a)(1) of the Act. The employer in *Babcock & Wilcox* was engaged in manufacturing, and its plant was located on a 100 acre tract about one mile from a community of about 21,000 people, in which lived about 40% of its 500 employees, the rest living within a 30 mile radius. The parking lot could be reached from a driveway which was entirely company property, except for a 31 foot public right-of-way extending from the highway. This strip was the only public place in the immediate vicinity of the plant at which leaflets could be distributed to employees. The Board found that, because of traffic conditions at that place, it was "practically impossible for union organizers to distribute safely to employees in motors [sic] as they enter[ed] or [left] the lot." *Id.* at 107, 76 S.Ct. at 681. The union had used the mails to communicate with over 100 employees, and had also visited homes and talked to employees on the telephone. The company had a non-discriminatory no-solicitation policy prohibiting such actions by non-employees on company grounds.

On these facts, the Court reversed the Board's conclusion that a violation of § 8(a)(1) had taken place. It ruled that the Board erroneously applied cases involving "employees isolated from normal contacts," *e.g.,* "personal contacts on streets or at home, telephones, letters or advertised meetings." *Id.* at 111, 76 S.Ct. at 684. The Court ruled:

> It is our judgment ... that an employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other *available channels of communication* will enable it to *reach* the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution....
>
> ... [I]f the location of a plant and the living quarters of the employees place the employees beyond the *reach* of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property. No such conditions are shown in these records.
>
> The plants are close to small well-settled communities where a large percentage of the employees live. *The usual methods of imparting information are available. The various instruments of publicity are at hand.* Though the quarters of the employees are scattered they are in reasonable *reach* ....

*Id.* at 112–13, 76 S.Ct. at 684–85 (citations omitted, emphasis added).

Try as I may, I fail to see any significant factual or legal distinction between those presented in *Babcock & Wilcox* and those in this appeal. A factual comparison is illustrative:

| | | Babcock & Wilcox | Lechmere |
|---|---|---|---|
| (1) | Nature of the business | Manufacturing plant | Retail store in shopping center |
| (2) | Description of private property in question | Plant located in 100 acre tract, with parking lot 100 yards away from public highway | Store located in 13.5 acres with parking lot immediately adjacent to public highway |
| (3) | Number of employees | 500 | 200 |
| (4) | Number of employees contacted by Union through various means | 100 | 41 |
| (5) | Percentage of employees contacted by the Union | 20% | 20.4% |
| (6) | Means of communication available | Personal contact in streets and homes, mailings, telephone calls | Some personal contact at homes and through handbillings, mailings, telephone calls to homes, pickets at public entrance, newspaper advertisments |
| (7) | Community characteristics | 40% of employees live in town of 21,000, the rest in radius of 30 miles | 89% of employees live in three "urban-suburban areas" (pop. 900,000) with a maximum distance of 15 miles between them |
| (8) | Board's findings regarding organizational activity on public highway adjacent to private property | "practically impossible for union organizers to distribute safely" | "ineffective and unsafe" |
| (9) | No-solicitation rule | Uniformly applied | Uniformly applied |

---

The only materially different fact in *Babcock & Wilcox* from the instant case is that, in *Babcock*, union organizers had the opportunity to speak with employees on the streets of the town. But, in that case, only 20% of the employees were ever contacted in any way by the union, and the *Babcock* opinion gives no indication of how many of those had the opportunity for face-to-face contact. In the instant case, by contrast, 20.4% of the employees were reached by four different mailings, and the Union had telephone numbers for half of these same employees. The Union also made ten home visits. There does not appear to be any reason for the Union's failure to make home visits to all those employees for which it had addresses, although the Board's opinion does say that many of the employees' parents would not permit their children-employees to come to the telephone. But the point remains that the Union in this case had the opportunity for at least as much face-to-face contact as did the union in *Babcock*. Furthermore, although at first glance the populations in *Babcock* (21,000) and the present one (900,000) appear to be a differentiating factor in favor of the Union, the litmus test indicates otherwise: in both cases the unions were able to *reach* the same percentage of employees, 20%. *See Monogram Models, Inc.*, 192 N.L.R.B. 705 (1971) (size of city, Chicago, did not alone make employees inaccessible in their homes). Thus the size of the communities in question did not affect the ability of the Union to reach its constituency.

Notwithstanding the obvious factual similarity between these two scenarios, the Board, although paying lip service to *Babcock & Wilcox,* concluded that Lechmere violated the Act by denying access by the Union to its property to conduct proselytiz-

ing activities. The difference in result between *Babcock & Wilcox* and the present case is the Board's newly-promoted *Jean Country* criteria, the crux of which is its balance-tipping dogma to the effect that barring "exceptional cases," the use of newspapers, radio and television will not be considered a feasible alternative to direct contact with the employees. Thus, *Jean Country* brings about a skewed result whereby granting non-employee organizers entrance to employers' property to carry out their activities becomes the rule rather than the exception, a classic case of the tail wagging the dog. I can find support in neither the Act nor in *Babcock & Wilcox* for such a rule, and in fact I believe it to be in direct contravention to the Court's holding in that case.

My disagreement with the Board stems from various sources, not least of which is its pointed disregard of the indistinguishable factual basis of the present case with *Babcock & Wilcox. See, ante* at 327. It is not only in the factual context, however, that *Jean Country* and the Board's decision in the present case transgress the principles laid down by the Court in *Babcock & Wilcox.* The clear impact of *Babcock & Wilcox* is that, in balancing the competing rights of the employer and the union, the Board should take into account the availability of "[t]he *usual* methods of imparting information ... [by the union, including] ... [t]he *various* instruments of publicity ... at hand." *Babcock & Wilcox,* 351 U.S. at 113, 76 S.Ct. at 685 (emphasis supplied). Yet the Board, under the guise of fact-finding and "expertise," in one clean swoop not only wipes out these specific directives but declares inexistent and impotent "the usual methods of imparting information" used by the entire advertising and publicity industry. This is a clearly unreasonable and arbitrary conclusion considering that these are the very tools normally used effectively by the political and commercial processes of this country, where in most cases actual personal contact is either minimal or absent. There is, of course, *nothing in this record,* or in *Jean Country,* to support such a wide

sweeping conclusion by the Board, whether it be considered a factual or a legal finding.

The Board's ruling in this case, and in *Jean Country,* to the effect that the use of newspapers, radio and television are ineffective methods of imparting information is not entitled to *any* deference under any of the recognized standards of review, all of which are ably recapitulated by the majority decision, *ante* at 317–18. If this be a factual determination, as stated above, there is not a scintilla of evidence much less "substantial" evidence to support it. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *see also* 29 U.S.C. § 160(e). If this be the application of law to fact, it is reviewable under the same standard, *see NLRB v. United Ins. Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968), and thus fails for the same reason. If the Board's resolution is seen as a mixed question of fact and law, it is entitled to deference only if it is factually reasonable and legally sound, i.e. so long as the Board's conclusion derives *plausibly* from the record. *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266–67, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975). This is clearly not the present case, as the record is bare of any such support. The last possibility, one not mentioned by the majority but which would seem to best characterize the real nature of the Board's actions in this case and *Jean Country,* is that the Board has attempted to exercise its rule-making authority. *See* 29 U.S.C. § 156; *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294–95, 94 S.Ct. 1757, 1771–72, 40 L.Ed.2d 134 (1974). If this be the case, the Board is equally lacking in support for its action, as "it is not entitled to disguise policymaking as fact-finding, and thereby to escape the legal and political limitations to which policymaking is subject." *NLRB v. Curtin Matheson Scientific, Inc., supra,* 110 S.Ct. at 1566 (Scalia, J., dissenting). *See* 29 U.S.C. § 156; *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (Board cannot replace the rule-making requirements of the Administrative Procedure Act with a rule-making procedure of its own invention).

The principal flaw in the Board's reasoning is that it equates an apparent *lack of interest* by Lechmere's employees with the Union's organizing campaign, with a lack of alternative means to *reach* these employees. The Board misconstrues *Babcock & Wilcox* in this respect. All that *Babcock & Wilcox* assures the Union is the *opportunity to reach* employees through "[t]he usual methods of imparting information." *Babcock & Wilcox*, 351 U.S. at 113, 76 S.Ct. at 685. *Babcock & Wilcox* is not a guarantee of success, it is only a guarantee of an *opportunity to reach* the employees with the Union's message.

The record in this case shows that the Union had ample opportunity to reach the employees. In fact, the Union was able to contact at least as many employees, percentage-wise, as the union in *Babcock & Wilcox*. Furthermore, the Union had a more diverse organizational campaign, and had more means available to impart its information, than did the union in that case, including the ability to carry out a six-month-long informational picket at the entrance to Lechmere's parking lot. Furthermore, the employees' homes in the present case were concentrated in a smaller geographical area than in *Babcock & Wilcox*. Although the total population in that area was considerably larger here than in *Babcock & Wilcox*, as it turns out, this is ultimately a neutral factor in the present case as the Union was able to *reach* the same percentage of employees, 20%, as in *Babcock & Wilcox*. Perhaps, as intimated by the Board's findings, *Lechmere, Inc.*, 295 N.L.R.B. No. 15, at note 10, the lack of receptivity of Lechmere's employees was due to the large number of teenagers composing its work force whose parents were apparently opposed to their children joining the Union. If that be the case, although unfortunate from the Union's viewpoint, it is certainly not a condition for which Lechmere can either be faulted or penalized in the exercise of its property rights.

The bottom line is that the Board has reached a wrong and unsupported conclusion in finding that the Union did not have reasonable alternative means of communicating with Lechmere's employees. In applying the *Babcock & Wilcox* balancing test, the Board, without any basis, labeled means of communication other than personal contact as ineffective. The Board has erroneously displaced the *Babcock & Wilcox* standard, which is reasonable opportunity to *reach* the employees with the union's message, and replaced it with a mechanistic approach which totally disregards "usual methods of imparting information," and is unfounded on the record.

Examination of previous application of the Supreme Court's standard illustrates how far the Board has deviated from *Babcock & Wilcox* in steering its present course under *Jean Country*. For example, non-employee access was allowed to company property in Alaska where the mining employees lived and worked on an island, and where they could only get to the mainland by chartered seaplane or boat. *Alaska Barite Co.*, 197 N.L.R.B. 1023 (1972), enf'd, *NLRB v. Alaska Barite Co.*, 83 L.R.R.M. (BNA) 2992 (9th Cir.), *cert. denied*, 414 U.S. 1025, 94 S.Ct. 450, 38 L.Ed.2d 316 (1975); *Husky Oil, N.P.R. Operations, Inc. v. NLRB*, 669 F.2d 643 (10th Cir.1982). Access by outside organizers was also granted in the case of company-owned towns, *NLRB v. Stowe Spinning Co.*, 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638 (1949), self-contained labor camps, *Petersen v. Talisman Sugar Corp.*, 478 F.2d 73 (5th Cir. 1973), isolated resort hotels wherein employees lived on the premises, *NLRB v. S & H Grossinger's, Inc.*, 372 F.2d 26 (2d Cir. 1967), and lumber camps in which the employees lived in company-provided and regulated housing, *NLRB v. Lake Superior Lumber Corp.*, 167 F.2d 147 (6th Cir.1948). However, access to the employer's property has been denied to non-employee union organizers in a variety of situations factually relevant to the present circumstances. For example, in *Monogram Models, Inc.*, *supra*, the Board ruled that the union was not entitled to access to the employer's property because it could reach the employees as they drove off a highway and down a 30 foot access road into the plant, and could reach employees at transportation pickup points in the city, or at their homes

by mail, telephone and personal visits. The size of the city, Chicago, did not alone make employees inaccessible in their homes. In *Falk Corp.*, 192 N.L.R.B. 716 (1971), the Board denied access where the union was able to pick out the employees' license numbers as they left the plant and thereafter get their home addresses from the state license bureau. A similar result was reached by the Board in *Lee Wards,* 199 N.L.R.B. 543 (1972), which involved the parking lot of the employer's retail store, in which it was ruled that reasonable access to employees existed because organizers could stand on an easement adjacent to the parking lot and record the license numbers of the cars entering the lot before the employer's retail hours. *See also NLRB v. Solo Cup Co.*, 422 F.2d 1149 (7th Cir.1970). And in *NLRB v. Sioux City & New Orleans Barge Lines, Inc.*, 472 F.2d 753 (8th Cir.1973), the court ruled that a union did not have the right to board river towboats to reach employees who worked shifts of 30 to 60 days, where the record showed that with extra effort, the union could achieve personal meetings with off-duty employees without boarding the towboats. All of the above clearly illustrate that *Babcock & Wilcox* requires that "employees [be] *isolated* from normal contacts," *Babcock & Wilcox*, 351 U.S. at 111, 76 S.Ct. at 683 (emphasis supplied), before entry to the employer's property is required.

*Jean Country* is just another of the Board's periodic attempts to expand *Babcock & Wilcox*, all of which have, in the past, received little encouragement from the courts. A clear example of this was the Board's attempt to apply First Amendment criteria to organizational activity in private shopping centers. Although it met with some initial success, *see Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), the Supreme Court eventually rejected this end-run tactic and it is now well-settled that the *Babcock & Wilcox* rationale is controlling. *See Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Central Hardware Co. v. NLRB*, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972).

Although adaptation of the Act "to changing patterns of industrial life is entrusted to the Board," *NLRB v. J. Weingarten, Inc.*, 420 U.S. at 266, 95 S.Ct. at 968, thus allowing the Board to reappraise prior rulings, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987). At the very least, "an agency changing its course ... is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency ... act[s] in the first instance." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). It is this reasoned analysis which the Board has failed to provide. *Ex cathedra* dogma is hardly reasoned analysis, particularly when we consider that what the Board is attempting to accomplish is the reversal of Supreme Court doctrine. Such imperious conduct can hardly be countenanced from an administrative agency which the law prohibits from acting in an arbitrary or capricious fashion. 5 U.S.C. § 706(2)(A); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

For the above reasons, I respectfully dissent.